IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

STEVEN BOLIN,

      Plaintiff,

v.                                        CASE NO. 2:09-cv-00117

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


# M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the court on briefs in support of judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Steven Bolin (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 28, 2006, alleging disability as of March 1, 2003, due to broken back, bipolar, migraines, antisocial, obsessive compulsive disorder (OCD), suicidal, sleeping problems, arthritis in knees, back and neck, hiatal hernia, gastroesophageal reflux disease (GERD), mood swings with poor concentration, shoulder pain and back pain. (Tr.

at 13, 148-50, 151-53, 287-92, 306-311.)  The claims were denied initially and upon reconsideration.  (Tr. at 13, 92-96, 97-101, 106-08, 109-11.)  On August 25, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 112.)  The hearing was held on February 13, 2007, before the Honorable Theodore Burock.  (Tr. at 113, 644-82.)  By decision dated September 10, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-25, .)  The ALJ's decision became the final decision of the Commissioner on January 30, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-8.)  On February 10, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not

disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f)(2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of a neck impairment, a back impairment, a low back impairment, a left shoulder impairment, and reflux disease secondary to a hiatal hernia. (Tr. at 16-18.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18-19.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 19-23.) As a result, Claimant cannot return to his past relevant work. (Tr. at 23-24.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as furniture assembler and production or labor/material handling, which exist in significant numbers in the national economy. (Tr. at 24-25.) On this basis, benefits were denied. (Tr. at 25.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial

evidence.    In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was forty-four years old at the time of the administrative hearing.  (Tr. at 649.)  He has a high school education.  He completed the tenth grade and obtained a GED in approximately 1981.  (Tr. at 651.)  In the past, he worked as a laborer, shift leader, and trainer for a trucking company, a plastic die-machine operator, and a dishwasher.  (Tr. at 652, 669-

5

73.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Evidence</u>

On April 10, 2002, David A. Sherbondy, D.C., states in a "To Whom It May Concern" letter:

> Steve Bolin has been treated off and on in this office for various neck and back problems and more recently neck, upper back and left shoulder problems... After reviewing Steve's medical history and his current objective findings my recommendation is that Steve seek employment that involves less physical strain on his neck and back.

(Tr. at 518.)

On July 16, 2003, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant had no manipulative, visual, communicative, or environmental limitations, except to avoid concentrated exposure to hazards. (Tr. at 462-67.) It is noted that the exertional and postural limitations pages are missing from the assessment and that the evaluator's name and comments are illegible.

On September 10, 2003, Rodolfo Gobunsuy, M.D. completed a Disability Determination Evaluation for the West Virginia Disability Determination Service following his examination of Claimant. (Tr. at 457-61.) Dr. Gobunsuy concluded:

> 1. Steven stated that he fractured his T12. The tenderness elicited on examination of his back was higher

6

than that.  The range of motion of his lower back is
normal.
2.  He has history of right shoulder injury, there is no
indication of significant posttraumatic arthritis of the
same.  The range of motion is slightly affected.  He has
no atrophy of the right shoulder muscle.
3.  He has bipolar affective disorder and this is being
followed up by Dr. Ahmed.  He is alert, cooperative and
he responded appropriately.

(Tr. at 459.)

The record contains chiropractic care reports dated November
14, 2003 to April 9, 2004.  (Tr. at 415-26.)  The unsigned initial
intake report dated November 14, 2003 states "Oct 01 fell down
stairs broke chest bone and hyper extended Rt [right] shld
[shoulder].  March 02 strained LB [lower back] carrying and lifting
at work.  Doesn't recall year but has broke T12 and approx 10 years
ago had car accident.  Patient has attorney and filing for
disability."(Tr. at 218.)

On November 14, 2003, a patient information form from Kominsky
Chiropractic Center states that Claimant's current complaints are
"back and neck pain muscle spasms."  (Tr. at 521.)

On November 18, 2003, Jack Henry, D.C., Spinal Imaging, Inc.,
reported that he had examined radiological views of Claimant's
cervical, thoracic, and lumbar spine on November 14, 2003.  (Tr. at
419-21.)  He noted "mild spondylosis, C5 disc level with disc
narrowing, C5 level...spondylolysis with developmental wedging and
Schmorl's node herniation defects mid and lower thoracic
spine...mild spondylosis, lumbar spine."  (Tr. at 418-21.)

Eighteen progress notes dated November 14, 2003 to March 16, 2004 are signed by Robert Schuezt, Licensed Physical Therapist, Better Health, Inc. (Tr. at 422-26.) The report dated November 14, 2003 states "Long Term Goals: For pt. [patient] to be 100% functional with light to mod. [moderate] ADL's [activities of daily living]." (Tr. at 425.) The progress note dated March 16, 2004 states: "Pt's [patient's] LBP [lower back pain] feels 70% better today. His trunk is WFL [within functional limits] except for flex., he lacks about 18-10 degrees. He tolerated US [ultrasound], massage and MFR [myofascial release]. He continues to do Williams & McKenzies and ambulates a mile+. He is 100% functional with light to mod. ADL's." (Tr. at 422.)

On December 1, 2003, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work without postural, visual, or communicative limitations. (Tr. at 449-53.) The only manipulative limitation was a limitation in reaching over head. (Tr. at 452.) Claimant was unlimited in environmental limitations with the exceptions of avoiding extreme cold and vibration. (Tr. at 453.) James K. Egnor, II, M.D., the evaluator, noted Claimant was "partially credible." (Tr. at 456.)

On January 9, 2004, Zucharan Surgh, M.D., stated in a form titled "Medical Consultant's Review of Physical Residual Functional Capacity Assessment" that he agreed that the December 1, 2003

medical consultant's conclusions were reasonable and supported by the evidence in file.  (Tr. at 429-30.)

On January 12, 2004, John E. Reifsteck, M.D., reported that an ultrasound of the gallbladder showed no evidence of cholelithiasis or biliary duct dilation and that an upper gastrointestinal study showed:

> 1.  Minimal irregularity in the proximal thoracic esophagus and region of the aortic know, most likely just the result of the thoracic aorta in this region. However, this could be the result of scarring.  Endoscopy may be of benefit.
> 2.  Ulcer in the region of the duodenal bulb.
> 3.  No other definite abnormalities on the upper gastrointestinal study.

(Tr. at 427-28.)

On May 19, 2004, Joe Othman, M.D., a neurologist, reported that he had examined Claimant at the request of Daniel Doyle, M.D., New River Family Health, following Claimant's reported weakness and twitching in his lower extremities, causing him to fall.  (Tr. at 410.)  Dr. Othman made these findings following his examination of Claimant:

> The patient is awake, alert, and oriented to the time, place, person and situation.  Does have decreased memory and mental status for his age.  Examination of the head atraumatic, normacephalic.   No masses, lesions or tenderness to palpatation.   Examination of the eyes normal, conjunctiva clear, pupils equally reactive to light.   Fundoscopic exam benign, normal discs, normal retina. Extraocular movements intact. Face symmetrical, tongue protrudes in mid-line, uvula is mid-line.   No thyromegaly or lymphadenopathy noted.   Examination of Ears normal canals, normal tympanic membrane. Examination of neck supple, carotids without bruit. Examination of chest, normal breath sounds, heart normal

S1-S2.  Examination of the upper extremities revealed increased reflexes 3+ bilaterally with normal tone, normal strength.  Examination of the lower back revealed mild tenderness bilaterally.  ROM in the lower back was within normal limits and there was no apparent spasm on either side.  Examination of the lower extremities revealed increased reflexes bilaterally, there is also stiffness of both lower extremities as well as spasticity.  The patient uses a cane upon walking, no ability to walk tandem.  Romberg sign negative.
<u>EEG</u>: Was within normal limits.
<u>CONCLUSION AND RECOMMENDATION</u>: Steven Bolin's mother is describing 3 distinct attacks were he "lost consciousness" for brief periods of time and he was on the floor.  It is not clear if he just lost his balance and fell or it was a true loss of consciousness but when he came too he was feeling weak in the lower extremities and there was no confusion, no excessive sweating, no tongue biting or bed wetting.  I don't think the attacks were seizures, most like he had recurrent attacks of falling maybe due to spasticity of the lower extremities.  I will obtain a MRI of the head and then decide to treat the spasticity of the lower extremities.

(Tr. at 410-11.)

On May 19, 2004, Dr. Othman wrote a second report stating that he had performed an EMG of both lower extremities of Claimant and nerve conduction studies of both the right and left lower extremity of Claimant.  He concluded: "The EMG and NCS of both the lower extremities and the lumbar paraspinals are <u>within normal limits</u>." (Tr. at 412-13.)

Records dated May 19, 2004, May 26, 2004, November 17, 2004, January 12, 2004, and January 13, 2005, indicate Claimant was treated by Dr. Othman with Lidocain injections and medications for low back pain.  (Tr. at 522-28.)

Progress notes from New River Health Association are dated

10

November 4, 2005, November 11, 2005, November 28, 2005, January 6, 2006, January 25, 2006, January 26, 2006, February 8, 2006, April 3, 2006, and May 30, 2006. (Tr. at 320-24, 370, 557, 560, 562-65, 567-69.) These notes are signed by Jamie Settle, PA-C [physician assistant-certified] and indicate Claimant was treated for muscle, back and shoulder pain with Ultram, Flexeril, Darvocet, and Lodine. (Tr. at 557, 560, 562, 565, 567.)  Claimant was also treated for GERD, bronchitis and sinusitis.  (Tr. at 567-68.)  The November 4, 2005 note states:

> I told Steven I would not address any of his bipolar, anxiety or depression.  He needs to keep this followed up with Dr. Hasan... I'm not touching any of his medications associated with that.  He is also here for problems with his back.  He has a history of osteoarthritis of the lumbosacral areal. He has tried OTC medications with little relief.  He recently has been taking his mother's Lortab 5/500.  States that it helps with the pain.  He denies any pain at this time.  He also has a history of GERD as well as controlled on Prevacid.

(Tr. at 569.)

A Health History Form completed by Claimant on November 4, 2005 for the New River Family Practice states in response to the question "What are your needs and/or questions for today?": "nerves, anxiety, GERD, anti social - bad thoughts and feelings, back prob [problem] prev [previous] break." (Tr. at 325-27, 570-71.)

On November 8, 2005, Lisa Karcher, a physical therapist, provided an initial evaluation of Claimant and determined physical therapy would not be continued due to Claimant's "signs and

11

symptoms indicating possible instability at T12." (Tr. at 317.)

On November 28, 2005, Frank A. Muto, M.D. reported that the two views of Claimant's lumbar spine show "no acute osseous abnormality" and the two views of the thoracic spine show "spondylosis of T12/L1. I do not see evidence of acute fracture or malalignment. There is minimal loss of height of the lower thoracic vertebral body (approximately T12) on the lateral view, though it is not confirmed on the frontal view." (Tr. at 321, 578.)

On February 6, 2006, Lisa R. Muckleroy, physical therapist, discharged Claimant to a home program because he had "progressed to 45 minutes exercise in the pool and 30+ minutes TE [training equipment] in the gym...pt. [patient] put PT [physical therapy] on hold as he is being referred to a doctor for pain management. Observed pt. with much improved posture and improved movement patterns overall in the gym and in the pool." (Tr. at 529.) Notes indicate Claimant had ten physical therapy sessions from November 29, 2005 to January 16, 2006. (Tr. at 530-32.)

On May 5, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl. The evaluator found no manipulative limitations, except for a limitation in reaching all directions, and no visual or communicative limitations. Environmental limitations were unlimited except to

avoid concentrated exposure to cold and vibration, and to avoid even moderate exposure to hazards. (Tr. at 279-86.) The evaluator, Ronald L. Hudson, noted:

> No evidence of surgery or pain clinic treatment for allegation of back injury. He did have a series of injections (TPI L-spine) for back pain. He also attended a very short course of physical therapy. However, claimant's statements are only partially credible in light of available physical findings and alleged limitations per adult function report. ALJ decision of 10/28/05 reviewed and given appropriate weight.

(Tr. at 284.)

On May 30, 2006, Curtis Thomas, D.O., filled out a form titled "Medical Assessment of Ability to do Work-related Activities (Physical)." The form indicates that Claimant has back pain that affects his ability to lift, carry, stand, walk, and sit. The form further checks that Claimant can never climb, balance, stoop, crouch, kneel or crawl. (Tr. at 547-550.)

On May 30, 2006, Christopher A. Schlarb, M.D. provided a radiological report of Claimant's left shoulder at the request of Jamie Settle, PA-C: "Three views of the left shoulder were obtained. I see no fractures, dislocations or other acute abnormalities." (Tr. at 577.)

On July 3, 2006, Jamie Settle, PA-C, evaluated Claimant at the New River Health Association:

> Patient presents to clinic today states that he was doing some extra yard work yesterday, got really hot and lightheaded, sat down and rested, and drank lots of water and Gatorade and had noticed a significant improvement. However, has had a little bit of a headache ever since

13

then and has been unable to sleep secondary to the
headache. He is denying any neurological complaints.
States that his back and neck is still bothering him and
the medication seems to be controlling it well. He is
also complaining of left shoulder pain. X-ray of the
left shoulder was completely normal. He has problems
with abduction and extension...

Plan: He is to continue with all of current medications.
He was given refills on the Ultram, Flexeril, and
Darvocet #60 with no refills. He was told to decrease
his heavy lifting and continue with the back brace. He
was also told to avoid doing yard work in the heat of the
day and is to do it in the early morning or late evening
hours and drink plenty of water and Gatorade. I want to
see him in approximately three months for a follow up but
can return sooner if other problems arise.

(Tr. at 551, 613.)

On August 9, 2006, a State agency medical source completed a

Physical Residual Functional Capacity Assessment and opined that

Claimant could perform light work with the ability to frequently

climb ramp/stairs, kneel, crouch, and crawl and to occasionally

climb ladder/rope/scaffolds, balance, and stoop. The evaluator

found no manipulative, visual or communicative limitations.

Environmental limitations were unlimited except to avoid

concentrated exposure to extreme cold, vibration, and hazards.

(Tr. at 599-606.) The evaluator, Caroline Williams, M.D. found

that x-rays of Claimant's left shoulder, lumbar spine, and an

EMG/NCS were normal and that an x-ray of the thoracic spine was

within normal limits. (Tr. at 604.) Dr. Williams further noted:

Claimant's allegations are not totally credible in that
the alleged symptoms and subsequent disability are
disproportionate to the medical evidence found in the
file. Claimant has documented hx [history] non-

14

> compliance re: pain mgmt [management] ie [*id est*, that
> is] abuse of mother's opiod rx [prescription] and
> discharge from pt [physical therapy] secondary to no show
> for f/u [follow-up]... Claimant's ADL [activities of
> daily living] do not appear to be as limited by physical
> impairments to the degree of which claimant alleges. The
> MER [medical evidence record] does not support the
> presence of significant physical impairment limitations
> nor the degree of disability Claimant alleges. ALJ
> Decision of 10/28/05 reviewed and given appropriate
> recognition. RFC [residual functional capacity] is
> reduced to light exertional with postural and
> environmental limitations as noted.

(Tr. at 604.)

On August 30, 2006, Russell F. King, II, M.D. reported to

Jamie Settle, PA-C, his findings in a radiological report of

Claimant's cervical spine:

> On the lateral view, vertebrae are visualized to C6.
> They are normal in alignment. There is no subluxation or
> fracture. The oblique views are not truly oblique and I
> cannot adequate evaluate the neural foramina.

(Tr. at 614.)

On October 3, 2006, Ms. Settle reported that she had evaluated

Claimant:

> The patient presents to the clinic today stating that he
> has noticed an improvement in the back pain since
> starting the Neurontin. He is still having some of the
> cervicalgia but states that it is significantly better.
> I did get an x-ray of the C spine which was completely
> normal. He does not need refills on anything at this
> time. Denies any other complaints.

(Tr. at 608.)

On December 4, 2006, Ms. Settle, PA-C, evaluated Claimant:

> The patient presents to the clinic stating that the
> Darvocet is not helping for the back pain. He has also
> stopped taking the Ultram altogether due to the fact that

15

> it was not helping.  He would like to try something else,
> but I want him to try taking Davocet tid [three times a
> day] instead of just bid [twice a day].  He is also
> complaining of some epigastric pain with increased GERD,
> heartburn, and belching.  He was on Prevacid but has been
> out of it for the last couple of months and has been
> taking quite a bit of OTC [over the counter] Prevacid and
> Rolaids with little relief.

(Tr. at 607.)

On January 8, 2007, Sabean Koreshi, M.D., New River Health

Association, noted that Claimant was there for a follow-up:

> He sees Jamie Settle, PA-C, in the clinic.  He is
> currently on Darvocet... Patient says that the pain is
> about okay with the Darvocet but he thinks he is
> developing tolerance to the pain medication...I will go
> ahead and schedule him for an MRI of the cervical,
> thoracic, and lumbar spine.  We will also refer him for
> pain management for further treatment and evaluation.

(Tr. at 615.)

On February 1, 2007, West Virginia Medical Institute issued a

document titled "Notice of Denial" which states:

> Service Requested: MRI [magnetic resonance imaging] of
> the Thoracic (*Note*: Handwritten next to this is "lumbar
> and cervical spine")
> A request for prior authorization was submitted for
> imaging services.  Based on the medical information
> provided, the request has been denied.
> Reason for Denial: InterQual criteria not met,
> specifically; the documentation of signs and symptoms do
> not support the medical indications for this study.
> There is no documentation of a reason why this would not
> be indicated.

(Tr. at 177, 616.)

Additional Physical Evidence Presented to the Appeals Council

On May 30, 2008, Ms. Settle, PA-C, reported that Claimant had

returned to the clinic for follow-up on his "multiple medical

16

problems including Hyperlipidemia, GERD, COPD [chronic obstructive pulmonary disease] & psychiatric problems. He is still seeing Dr. Hasan for his psychiatric care. He also has chronic pain but is willing to wean himself off of the Darvocet. He is denying any new problems or complaints at this time." (Tr. at 623.)

On July 11, 2008, Ms. Settle, PA-C, stated in a progress note:

The patient presents to the clinic. I have seen this patient for a long time. Ever since I have seen him, he has had problems with chronic thoracic pain. I have tried multiple medications and multiple treatments for him. There have been a majority of times that he has asked for narcotic medications, and I told him that I do not feel comfortable giving him those. He did have a suicide attempt a couple of months back and admits that this was not his first suicide attempt and that he had another one about 25 years ago, and his first one was at the age of 8 whenever he swallowed a bottle of pills. The patient states that he has tried every type of suicide except for the one sure fire way but states that it is too messy. When asked what he meant by this, he said that he knew if he cut his carotid artery, that would be a definite way to commit suicide. The patient states that he is just waiting for death but is not going to commit suicide at this time. As soon as I entered the examination room, I said hi to him and asked him how he was doing. He asked me if that was a rhetorical question because he obviously thought that I do not care because I am not giving him any pain medication to help with his back pain. He also told me to no longer address him as Steven or Mr. Bolin and to address him as Mr. Hyde because now he is Mr. Hyde from Jekyll and Hyde. The patient was very confrontational through the whole entire examination and was easily irritated and agitated. There was also some obvious depression. The patient got aggravated and stated that he ended up "fucking himself over" whenever he did that last suicide attempt. He did apologize for cursing but states that since then he knows that he will not ever be able to get narcotic medications from myself or any other New River provider. The patient also goes on to state that he has read an article in a magazine stating that physicians have a tendency to lie and twist the truth and that physicians usually do not

17

care about the well-being of the patient; they just care
about getting paid.  The patient is wanting to get on
disability and states that as soon as he does get on
disability, he is going to go see a real doctor so he can
get some medication for his pain.  I did tell the patient
that if he is not satisfied with his current care, he is
more than welcome to find another provider and I would
help him find somebody else if he is willing to do this;
and the patient states he wants to stay with me.  I also
told him that even though I cannot give him narcotic
medications due to his previous suicide attempt and the
liability that it holds, there are other options of
dealing with his chronic pain.  I told him we could do
trigger point release by Mariani Didyk, but the patient
states that she does not like him and he hates her and
stated, "I would rather knock her head off than see her."
I told him that we could do physical therapy, but he
stated that it does not work.  I told him about
osteopathic manipulation therapy that possibly Dr. Todd
Berry could perform, and he is wiling to try this.  I
also told him that I could try him on a little bit of
Ultram to help with the pain, and he states that nothing
usually works for the pain.  He has also even bought
oxycodone and OxyContin off of the street, 10 mg of each
one, and did not see any improvement in his pain.  The
patient is currently seeing Sarah England for his
psychiatric care and is wanting to keep a followup
appointment with her...

I did once again tell the patient that if he is not happy
with his care here, he can transfer his care elsewhere
and I would be more than happy to help him. But he is not
wanting to do that at this time.  The patient's
confrontation level continues to worsen, and I am going
to talk to another provider about possibly transferring
care within New River Health to a different provider.
The patient will be contacted if this does happen.  DHHR
physical form was filled out and will be sent to DHHR.

(Tr. at 636-37.)

On July 25, 2008, Phillip Todd Berry, D.O., New River Health

Association, evaluated Claimant:

Patient was referred in for OMT [osteopathic manipulative
therapy] for his back.  Previously he had seen Jamie
Settle and had a very disagreeable visit with her at last

18

visit.  He became quite uncooperative as well as being
vulgar essentially demanding narcotic medication.  At
that time Jamie did refuse him and offered him OMT
[osteopathic manipulative therapy].  He agreed to
comply...I did start with an OA [occipitoatlantal, a
region of the body located at the back of the skull]
release as well as soft tissue release and stretching of
the cervical spine as well as the head.  Patient seemed
to tolerate this well.  Then we did a leg tug on the left
with a OB roll and patient responded well to this with
some relief.  Then performed soft tissue release of the
thoracic, lumbar and sacral spine as well as prone HVLA
[high-velocity, low amplitude] to the dorsal spine. Knee
to chest stretching was performed and patient was
instructed on how to complete these at home on a twice
daily basis.  Also at this time I did recommended that
the patient use ice packs 15 minutes out of every hour
for a period of 4 hours as well as Motrin over-the-
counter for inflammation.   I have also offered him
physical therapy as well as a trigger point injection.
The patient declines this at the current time.   He
repeatedly asks is this all we are going to do for my
pain.  My reply to this was yes.  I told the patient that
he may return for further OMT therapy if he felt this was
helpful.   It is noted that the patient's mood and
demeanor changed dramatically at the end of the interview
becoming agitated as he left the room.

(Tr. at 638.)

On October 6, 2008, Ms. Settle, PA-C, stated in a note:

Patient presents to the Clinic.  He is here today for a
F/U [follow-up] on his multiple medical problems
including hyperlipidemia and chronic back pain.  He is
still seeing Sarah L. England, PA-C for his bipolar
disorder and does seem to be well-controlled on that.
Patient is finally willing to restart NSAIDs [Non-
Steroidal Anti-Inflammatory Drugs] for his back pain due
to increased pain.  He is also complaining of sinus pain
and pressure, nasal congestion, postnasal drainage, a
cough productive of yellow phlegm, and some SOB
[shortness of breath] and wheezing.  He is still smoking
and does not want to cut back at this time... He can do
his medical F/U with Sarah L. England, PA-C since I will
be leaving and he is agreeable to do this in three to
four months.

19

(Tr. at 642.)

Psychiatric Evidence

Records from the District Court of Iowa, Des Moines County, dated May 28, 2002, state that Claimant left a suicide note before injecting himself with air. (Tr. at 333-41.)  Additional records indicate Claimant was admitted to the psychiatric ward through the Emergency Department of the Great River Medical Center, West Burlington, Iowa, on May 28, 2002 and discharged on June 4, 2002. (Tr. at 502-17.)  Claimant underwent a court ordered psychiatric evaluation on June 3, 2002, wherein it was determined that Claimant did not require court ordered treatment.  The evaluating physician recommended that Claimant undergo outpatient psychiatric services without court supervision.  (Tr. at 342-45.)

On July 23, 2002, Claimant underwent a psychiatric evaluation by Ayman Hanna, M.D. of Touchstone Behavior Counseling.  Dr. Hanna stated:

> **HISTORY OF PRESENT ILLNESS**: The pt. [patient] has a history of depression of about six years.  He was taking Celexa 60 mg. once a day which seems to help his depression.  Lately the pt. has been getting into brief periods for one week at a time of irritability, hyperactivity and racing thoughts which interfere with his function and level.  But the pt. would be able to keep his job up.  Last time that the pt. had such an episode was about four weeks ago.  Finally the pt. decided to come to seek help for this irritability...
> **IMPRESSION**: The pt. has described hypomanic episodes when he gets into that irritability and rapid speech and hyperactivities and not being able to sleep.  His temper gets out of control during these episodes.  Later on the patient goes deeper in depression.  It seems that the pt. suffers from bipolar II disorder...We will start the pt.

20

> on Depakote 500 mg po BID and continue Celexa and we will
> see the pt. in three weeks for re-evaluation of
> medications and his mood.

(Tr. at 499-500.)

Treatment update notes from Dr. Hanna are dated August 15, 2002, September 17, 2002, October 15, 2002, November 5, 2002, December 3, 2002, January 2, 2003, January 28, 2003, February 25, 2003, and April 22, 2003. (Tr. at 490-98.) The notes describe medication management, ongoing marital issues, and anger management problems. (Tr. at 490-98.) The notes dated January 28, 2003 state: "Patient was fired from his job at Ryan's because he refused to do all the dishes by hand because the dishwasher was broken. Patient also has been having problems with his wife...and his wife asked him to move out." (Tr. at 492.) The notes dated April 22, 2003 state:

> He requested medications because he is moving to West
> Virginia. He was disheveled, was tearful and described
> his mood as depressed and stressed out. Denies suicidal
> or homicidal ideations. No delusion was elicited. Has
> good insight and judgment. The pt. got into a verbal
> altercation with his wife and she kicked him out of the
> house...The pt. is planning to move to stay with his
> mother in West Virginia.

(Tr. at 490.)

A form report titled "West Virginia Department of Health and Human Resources General Physical (Adults)" is dated June 13, 2003 and signed by Tammy Campbell. In response to the question "Is applicant able to work full time at customary occupation or like work?", Ms. Campbell states:

> I do not have enough information (records) on patient to

21

> determine this...certainly this gentleman's medical
> records relating to his neck and back need to be reviewed
> and possibly reevaluated.  His psychological records also
> need to be reviewed.  Bipolar disorder is treatable –
> very successfully in many people.  He is young enough to
> be rehabilitated.  He has a variety of experiences also
> that may serve him well now.

(Tr. at 393.)

The record contains thirty-four progress notes from New River Family Health Center dated June 13, 2003 to October 20, 2005. Although many of the handwritten reports are illegible, the legible records indicate Claimant was treated for bipolar disorder, depression, and anxiety.  (Tr. at 327-32, 347-75, 381-409.)

On July 16, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe.  (Tr. at 469.)  The evaluator, Robert Soloman, Ed.D., based his opinions upon the medical disposition category of Affective Disorders.  (Tr. at 469.)  Dr. Soloman noted that Claimant's affective disorder was bipolar disorder.  (Tr. at 472.) Dr. Soloman opined that Claimant had a mild degree of limitation in difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, no degree of limitation in restriction of activities of daily living, and no episodes of decompensation.  (Tr. at 479.)  He found no evidence to establish the presence of the "C" criteria.  (Tr. at 480.)

On July 16, 2003, Kelly Rush, M.A., Supervised Psychologist, and Dale M. Rice, M.A., Licensed Psychologist, provided a

22

Psychological Evaluation of Claimant. (Tr. at 484-88.) The psychologists noted that Claimant was unemployed and recently quit his job as a dishwasher operator because "I didn't want to do dishes by hand cause the washer broke." (Tr. at 485.) They further noted Claimant's history of one arrest for burglary and one arrest for child molestation. (Tr. at 486.) [*Note*: During re-examination by the ALJ, Claimant stated that he served two and one-half years on each charge. (Tr. at 667-68.)] Their findings were:

**MENTAL STATUS EXAMINATION**
**Orientation** - He was alert throughout the evaluation. He was oriented to person, place, time and date.
**Mood** - Observed mood was euthymic.
**Affect** - Affect was broad and reactive.
**Thought Processes** - Thought processes appeared logical and coherent.
**Perceptual** - He reports no unusual perceptual experiences.
**Insight** - Insight was fair.
**Judgment** - Within normal limits based on his responses to the finding the letter question. He stated "mail it."
**Suicidal/Homicidal Ideation** - He reports a history of five suicidal attempts in which he overdosed on medication and "pumping air in my veins." His last attempt was in 2001. He denies current suicidal ideation. He denies homicidal ideation.
**Immediate Memory** - Immediate memory was within normal limits. He immediately recalled 4 of 4 items.
**Recent Memory** - Recent memory was within normal limits. He recalled 3 of 4 items after 30 minutes.
**Remote Memory** - Remote memory was within normal limits based on ability to provide background information.
**Concentration** - Concentration was within normal limits based on his ability to do serial 3's.
**Psychomotor Behavior** - Normal.

**DIAGNOSTIC IMPRESSION**
AXIS I:    296.80     Bipolar Disorder NOS
AXIS II:   301.9      Personality Disorder NOS
AXIS III: By self report: back and neck problems, GERD
          and migraines

23

**RATIONALE**
Mr. Bolin was given the diagnosis of Bipolar Disorder NOS based on the following criteria: episodes characterized by depressed mood, increase in weight, crying spells, feelings of worthlessness and hopelessness, sleep difficulty and difficulty concentrating.  He reports an episode will last one to two days.  He also reports episodes characterized by racing thoughts, excessive energy, a decreased need for sleep and pressured speech. He reports an episode will last approximately three days. He does not meet criteria for any specific Bipolar Disorder due to rapid alteration.  It appears that Mr. Bolin has long standing deficits in his personality which do not necessarily meet criteria for any specific personality disorder.   Therefore, a diagnosis of Personality Disorder NOS is given.

**DAILY ACTIVITIES**
**Typical Day**: Mr. Bolin goes to bed at 10:00 pm and gets up at 9:00 am.  He gets up, drinks coffee, smokes, plays on the computer, visits with his mother and her boyfriend, listens to the radio, watches tv, eats, plays on the computer, watches tv, eats, watches tv, take his medicine, showers and goes to bed.
**Activities**:
**Daily** - takes medicine, drinks coffee, smokes, plays on the computer, listens to the radio, watches tv, eats, visits with family, showers and goes to bed
**Weekly** - sweeps the floors, goes to the grocery store and mows the lawn
**Monthly** - goes to the doctor
**Hobbies/Interests**: playing the harmonica and woodworking
**SOCIAL FUNCTIONING**
During the evaluation, social functioning was within normal limits based on his interaction with the examiner.
**CONCENTRATION**
Attention/concentration were within normal limits based on his ability to do serial 3's.
**PERSISTENCE**
Persistence was within normal limits.
**PACE**
Pace was within normal limits based on the mental status examination.
**CAPABILITY TO MANAGE BENEFITS**
Mr. Bolin appears capable to manage any benefits he might receive.
**PROGNOSIS**: Fair.

24

(Tr. at 486-88.)

On December 10, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe. (Tr. at 435, 447.) The evaluator, H. Hoback Clark, M.D., based his opinions upon the medical disposition categories of Affective Disorders and Personality Disorders. (Tr. at 435.) Dr. Clark noted that Claimant's affective disorder was bipolar syndrome. (Tr. at 438.) He further noted "Personality Disorder NOS [not otherwise specified]." (Tr. at 442.) Dr. Clark opined that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 445.)

On January 8, 2004, Maurice Prunt, Ph.D., stated in two forms titled "Medical Consultant's Review of Mental Residual Functional Capacity Assessment" and "Medical Consultant's Review of Psychiatric Review Technique Form" that he agreed that the December 10, 2003 medical consultant's conclusions were reasonable and supported by the evidence in file. (Tr. at 431-34.)

An MRI of the Claimant's brain, with and without contrast, was performed on May 21, 2004, at Raleigh General Hospital at the request of Dr. Othman. (Tr. at 407.) Andrew Goodwin, M.D., reported:

> MRI images of the brain were obtained. Multiplanar,
> multisequence imagining was performed... Ventricles are

> normal in size, shape, and position.  There is no area of
> signal abnormality.  There is no evidence of mass effect.
> Images were obtained after gadolinium.   There is no
> evidence of enhancing lesion on the post gadolinium
> images.
>
> Impression: No abnormalities noted in the MRI images of
> the brain both without and with gadolinium
> administration.

(Tr. at 379.)

Progress notes from New River Family Health Center dated June

16, 2005 and August 18, 2005 are signed by M. K. Hasan, M.D.  The

notes state that Claimant's "depression and anxiety are under much

better control" and that Claimant was "alert and oriented" with "no

evidence of psychosis or thought disorder."  (Tr. at 328-29.)

The most recent New River Family Health Center records, signed

by Debra Moon, C-FNP [certified-family nurse practitioner], are

dated October 20, 2005.  The notes state:

> S: This is a white male who is being followed by us due
> to bipolar disorder. He reports being somewhat depressed
> and irritable. Has not heard from the law judge regarding
> his disability.  States he was supposed to find out
> within 120 days but this time has lapsed.  He is in
> contact with his attorney.  He reports medication has
> been helping him and that his mood is more stable.
>
> O:  Alert and oriented x3.  Neat, tidy, cooperative, and
> relevant.  His affect and mood seem to be appropriate.
> He denies any suicidal ideation, hallucinations, or
> delusions.
>
> TREATMENT PLAN: He is to continue Ativan 2 mg b.i.d.,
> #55, Lithium 600 mg q.h.s.; Tegretol 400 b.i.d.; and
> Seroquel 50 q.a.m. and 100 q.h.s.  Effects and side
> effects of medication were discussed.  He is to RTC in
> two months or soon PRN.

(Tr. at 327, 572.)

A form report titled "West Virginia Department of Health and Human Resources General Physical (Adults)" is dated June 16, 2004 and signed by Linda Scarborough.  Although largely illegible, lines are checked indicating that Claimant is not able to work full-time and that his major diagnosis is "bipolar".  (Tr. at 377-78.)

On May 5, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe.  (Tr. at 545.)  The evaluator, Timothy Saar, Ph.D., based his opinions upon the medical disposition category of Affective Disorders, bipolar.  (Tr. at 533, 536.)  Dr. Saar opined that Claimant had a mild degree of limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.  (Tr. at 543.) He found that the evidence does not establish the presence of the "C" criteria.  (Tr. at 544.)   He further noted: "Analysis; clmt [claimant] appears credible.  ALJ Decision reviewed and given controlling weight.  Tx [treating] source reports clmt is doing "fairly well."  All areas mildly limited.  Evidence does not support severe limitations.  Decision - Impairment not severe."  (Tr. at 545.)

On June 30, 2006, Dr. Hasan filled out a form titled "Medical Assessment of Ability to do Work-related Activities (Mental)."  (Tr. at 554-56.)  The form indicates that Claimant has a "fair" ability to adjust to a job regarding "follow work rules", "use judgment",

and "maintain attention/concentration"; a "poor" ability to adjust to a job regarding "relate to co-workers", "interact with supervisor(s)", "deal with work stresses", and "function independently"; and "none" ability to "deal with the public". (Tr. at 554.)   Dr. Hasan found Claimant to have a "good" ability to "understand, remember and carry out simple job instructions"; a "fair" ability to "understand, remember and carry out detailed, but not complex job instructions"; and a "poor" ability to "understand, remember and carry out complex job instructions." (Tr. at 555.) The evaluator further found that Claimant had a "fair" ability to "maintain personal appearance", "behave in an emotionally stable manner", and "demonstrate reliability"; and "none" ability to "relate predictably in social situations." (Tr. at 555.)  Claimant was deemed able to manage benefits in his own best interest. (Tr. at 556.)

Mental Health progress notes from Dr. Hasan of the New River Health Association, are dated April 28, 2005, June 16, 2005, August 18, 2005, December 8, 2005, February 9, 2006, May 11, 2006, June 8, 2006 and July 7, 2006. (Tr. at 552-53; 558-59; 561, 566, 573-75.) The initial note indicates: "The patient continues to do fairly well.  Says his medications work well.  Moods are more stable. Depression/anxiety more stable." (Tr. at 575.)   The most recent notes dated July 7, 2006 indicate:

Subjective:  This is a 43 y/o [year old] male who was seen in followup.  Patient reports doing well and stable

28

with current medications.  Patient reports no worsening
of psychiatric symptoms.  Taking medications as
prescribed and denies any side effects.  Sleeping and
eating well.  Patient denies any suicidal or homicidal
thoughts, hallucinations or delusions.

Objective: Patient is unkempt, cooperative, and relevant.
Casually dressed and appears stated age.  Maintains eye
contact and oriented to time, place, and person.  Speech
is of normal rate and volume.  Mood is stable.  Affect is
euthymic.  Thoughts are logical with no indication of
psychosis.  Psychomotor activity is normal.  Insight
judgment is fair.

Diagnoses: AXIS I: Major affective disorder, possibly
bipolar in nature, mixed affective state; history of
GERD; chronic pain syndrome...

Medications: Geodon 60 mg at bedtime
Tegretol 200 mg b.i.d.
Ativan 2 mg b.i.d.
Lithium carbonate in the form of Lithobid 600 mg at
bedtime...

Plan: Patient is currently stable with treatment.
Patient encouraged involvement in a hobby, exercise
routine, or church activity.  Effects and side effects of
medications discussed.  To continue a biopsychosocial
approach and refer for counseling as needed.  Patient to
continue medications as listed above.  Patient advised to
avoid all forms of illicit drugs and alcohol.  Compliance
with above treatment was stressed. Patient to return in
two months.  If any problems, call, return to clinic
sooner, or go to BARH ER [Beckley Appalachian Regional
Hospital Emergency Room].  The patient is advised to make
sure that there are no guns in the house despite denial
of any suicidal or homicidal ideations.  Counseling with
his counselor needs to be continued.  He is competent to
handle his financial affairs if disability is granted for
which he applied.

(Tr. at 552.)

On August 3, 2006, a State agency medical source completed a

Psychiatric Review Technique form and opined Claimant's impairment

was not severe.  (Tr. at 585.)  The evaluator, Jeff Harlow, Ph.D.,

29

based his opinions upon the medical disposition category of Affective Disorders. (Tr. at 585.) Dr. Harlow opined that Claimant had a mild degree of limitations in restriction of activities of daily living and in maintaining concentration, persistence, or pace, with no difficulties in maintaining social functioning and no episodes of decompensation. (Tr. at 595.) He found that the evidence does not establish the presence of the "C" criteria. (Tr. at 596.) He further noted: "This claimant's statements about functional capacities on the ADL form are partially credible because they are inconsistent with clinical findings of the treating source. Clinical findings of the treating source indicate that the mental impairments is (sic, are) not severe." (Tr. at 597.)

On August 31, 2006, Dr. Hasan reported that Claimant had been at the clinic for a follow-up visit:

> He stated that apart from pain, he is doing well...
> Patient is neat, tidy, cooperative and relevant.
> Casually dressed and appears the stated age. Maintains
> eye contact and oriented x 3. Speech is of normal rate
> and volume. Mood is stable. Affect euthymic. Thoughts
> are logical with no indication of psychosis. Psychomotor
> activity is normal. Insight and judgment are
> fair...Continue a biopsychosocial approach and counseling
> as needed. The patient advised to avoid all forms of
> illicit drugs and alcohol. Church, exercise and
> calisthenics were recommended. No homicidal or suicidal
> ideations were entertained. Compliance with treatment
> was stressed.

(Tr. at 609-10.)

## Additional Psychiatric Evidence Presented to the Appeals Council

On April 22, 2008, Sarah L. England, PA-C, psychiatry, New

River Health Association reported:

> Patient comes in today talking a lot about his constant
> pain, and not being able to sleep more than 3 hours a
> night.  He states the pain makes him irritable and
> difficult to get along with his family.  He does talk
> about death if he does not receive his disability this
> time around....Patient denies any suicidal or homicidal
> ideations, hallucinations, or delusions.

(Tr. at 619.)

On April 30, 2008, Ms. England, PA-C, stated in a telephone

note:

> Patient's mother called, whom he lives with, Patricia
> Gordon, stating that this morning Steve came in and
> kissed her on the head and told her good-bye, then
> proceeded to lock himself in his bedroom.  An ambulance
> was called to take him to BARH [Beckley Appalachian
> Regional Hospital].  He was cutting on his arms.  Mother
> reports that he carved 7-20 in his arm, and that is the
> day his dad passed away, and also the day his sister was
> killed by a drunk driver.  Mother is concerned about
> Steve signing himself out AMA [against medical advice]
> before getting treatment.  She will keep us informed of
> the situation, and I will f/u [follow-up] with Steve
> after discharge from BARH.

(Tr. at 620.)

Records from Beckley Appalachian Regional Hospital (BARH)

indicate that Claimant was admitted to the Psychiatry Department on

April 30, 2008 after initially being seen in the ER:

> after superficial lacerations to his left arm and carving
> 720 in his left arm.  The patient has history of
> psychiatric treatment at New River Family Health.  He
> reports that this was not a suicide attempt, that he did
> this as a plea for help, stating, "I thought if I did
> this, they would bring me to the ER and give me a pain
> shot, and I could go back home."  While he was in the ER,
> he was complaining that he could not get his medications
> as previously ordered, stating, "I wanted my medications,
> I had to get their attention, they wouldn't give me any,

31

I put a plastic bag over my head and I got my pain
pills." He said that he is here because his back hurts
so bad and the only way that he can get to the hospital
was to cut himself. The patient denies any prescription
drug abuse or street drug abuse, though his family
reports that he does have problems with prescription
drugs. He is also found to be somewhat delusional,
guarded, rambling in conversation, which is very
circumstantial, stating that he is anti-social, the water
is poisoned and complaining of hallucinations. He does
admit to increase in depression recently. He does have
history of suicide attempts. He carved 720 into his arm
because he reports that is the time that his father died
and his adopted daughter died. He is alert and oriented.
He is somewhat attention seeking, with behaviors that are
manipulative and are carried out for shock value. He
seems to have limited insight, judgment and impulse
control.

(Tr. at 624.)

Although the records do not contain a discharge summary, a

report from M. Khalid Hasan, M.D., with a transcription and

dictation date of May 2, 2008, states:

PSYCHIATRIC DIAGNOSES
AXIS I
Major depression, recurrent, moderate to moderately
severe in nature with paranoid ideations. Rule out
schizoaffective. Rule out substance abuse, denied by
patient...
RECOMMENDATIONS AND DISPOSITION
At the time of discharge, he was on Lamictal 200 mg at
bedtime and 100 mg in the morning; Lipitor 30 mg at
bedtime; Protonix 40 mg daily; methocarbomol 750 mg
b.i.d.; Geodon 40 mg b.i.d.; Prozac 40 mg once daily;
diazepam 10 mg at bedtime. Followup with me, also at New
River Clinic. Recommended following up family physician.
He was given a course of antibiotics in the form of
cephalexin, which were discontinued. Church,
calisthenics and exercise also recommended. He was
discharged with the above recommendations. The
importance of outpatient treatment and compliance was
stressed to him. Make sure there are no guns in the
house. Other pain medications need to be continued from
his pain physician, he is on Darvocet N 100 mg t.i.d.

32

(Tr. at 628-30.)

On May 15, 2008, Ms. England, PA-C, stated that Claimant is at

the clinic for a follow-up after his recent discharge from BARH:

> He reports doing fairly well.  Still having problems
> sleeping... He carved 720 in his left forearm... he has
> been picking off the scabs and wants this to scar as a
> reminder.  Today, there is pus coming from the wound.  It
> is very erythematous with mild edema, hot to touch.
> Mother reports that he has not been putting anything on
> it... Plan: Patient is to decrease Geodon to one q.d. and
> finish what he has left.  Rx for Vistaril 50 mg, 1-2 tabs
> PO q.h.s.  If this does not help with his insomnia, will
> try to get Rozerem approved by Medicaid.

(Tr. at 621.)

On June 10, 2008, Ms. England, PA-C, stated in a report:

> Patient reports doing fairly well.  He's been working on
> getting his cholesterol down, and he has reduced it from
> 800's to 200's.  He is decreasing his caffeine.  Still
> having sleep problems.  He's not getting any sunlight or
> exercise.  He's frustrated about not getting any answer
> regarding his disability.  His headaches have been
> decreased on the Verapamil...
> Mental Status: Alert & oriented x 3, in NAD.  Patient is
> neat, tidy, cooperative, and relevant.  Casually dressed
> and appears stated age.  Maintains eye contact.  Speech
> is of normal rate and volume.  Mood is depressed.  Affect
> euthymic.  Thoughts are logical with no indication of
> psychosis.  Psychomotor activity is normal.  Insight and
> judgment are fair. Attention and concentration are good.
> Memory is intact.  Patient denies any suicidal or
> homicidal ideations, hallucinations, or delusions.
> Psychiatric Diagnosis:
> Axis I: Bipolar disorder. Anxiety disorder. Chronic pain.
> Plan: Continue current medications.  Side effects of
> medications were discussed.  Continue a biophysical
> approach and refer for counseling as needed.  Patient is
> advised to avoid all forms of illicit drugs, alcohol, and
> tobacco.  Compliance with treatment stressed.  RTC
> [return to clinic] in 4 weeks.

(Tr. at 634.)

33

On July 8, 2008, Ms. England, PA-C, stated in a progress report that Claimant's mental status, psychiatric diagnosis, and plan remained the same as in the previous report. She also noted:

> Patient reports he's doing about the same mentally. His pain is worse. He reports that the Darvocet he was on previously only helped him a small amount, and now he has no relief. He reports he does not believe in taking any type of NSAID [nonsteroidal anti-inflammatory drug]. Appetite fluctuates. He reports that he continues to sleep during the day to stay away from his mom's boyfriend.

(Tr. at 635.)

On September 2, 2008, Ms. England, PA-C, stated in a note:

> Patient came in and slammed his Prozac prescription down on the table stating he cannot take it because he's on Tramadol. He states he has been looking at WebMD along with other Internet sites, and he says this is contraindicated. The patient states that the combination was giving him tremors and seizures. He talks about how he wants to get out of Jim's house and how Jim constantly talks about sex. The patient is very frustrated with his sleep and living situation, and the fact that he has not been awarded disability. Patient also talks about how no one is helping him with his pain. He is cursing quite frequently through this and frankly being very offensive...
>
> Plan: Discussed at length with patient that I would not tolerate his offensive language and talking about other NRHA [New River Health Association] providers. Explained to patient that he has gotten himself into the situation he is in and no medication is going to help until he starts to have a more positive outlook. He also now has a medical card, and if he is not happy with the care he is receiving at NRHA, he may seek care outside of NRHA. After this the patient calmed down quite dramatically and apologized over and over. Stop Prozac. Patient was given Risperdal 1 mg at bedtime x one week, and then 1 mg b.i.d. Side effects of medications were discussed. Continue a biophysical approach and refer for counseling as needed... RTC in three weeks. If there are any problems in the interim, the patient will return to the

clinic sooner or go to BARH ER.

(Tr. at 640.)

On September 18, 2008, Ms. England, PA-C, stated in a progress

note:

> Patient comes in today fairly upset.  He states that his
> close friend is sick and only has a 20% chance of living.
> He talks about that situation for a while and some
> problems he's having at home.  He states he's not noticed
> any change on the Risperdal, but today he was tearful,
> also smiling, joking much more than usual, which is a
> huge improvement, most of the time is angry.  He states
> his mother is upstairs trying to figure out what is going
> on with his Valium RX in the pharmacy.  I told the
> patient that if he didn't get answers that I would help
> him.  He needs labs today.

(Tr. at 641.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not
supported by substantial evidence because the ALJ failed to consider
the effect of major affective disorder on Claimant's residual
functional capacity to perform a wide range of light and sedentary
work.  (Pl.'s Br. at 14.) Claimant also argues that the ALJ erred
in failing to give proper weight to the treating physician's opinion
regarding Claimant's functional capacity.  (Pl.'s Br. at 14-16.)

The Commissioner argues that the ALJ's finding that Claimant
is not disabled is supported by substantial evidence and that the
ALJ fully complied with the regulations when he assessed Claimant's
mental condition and the treating physicians' opinions.  (Def.'s Br.
at 11-21.)

35

**Analysis of Psychiatric Impairments and RFC**

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider the effect of major affective disorder on Claimant's residual functional capacity to perform a wide range of light and sedentary work. (Pl.'s Br. at 14.)  Specifically, Claimant states:

> In this case, the ALJ found that the major affective disorder was a "non-severe" impairment which would impose no more than a minimal effect on the plaintiff's functional capacities but failed to identify specifically what those limitations were and how they would impact the plaintiff's ability to perform a wide range of light and sedentary work on a sustained basis.  There was analysis of the plaintiff's major affective disorder in his direct examination of the vocational expert but this analysis was not part of his decision.
>
> The ALJ's decision must be supported by substantial evidence.  In this record, there is no analysis of the limitations imposed by major affective disorder by the ALJ.

(Pl.'s Br. at 14.)

The Commissioner responds that Claimant's assertions have no merit because the ALJ properly complied with the regulations when he assessed Claimant's mental condition.  Specifically, the Commissioner states:

> As the ALJ correctly explained (Tr. 17), the regulations set forth that the severity of Plaintiff's affective disorder had to be assessed according to the degree of functional limitations it imposed in 4 broad functional areas...episodes of decompensation; activities of daily living; social functioning; and maintaining concentration, persistence, or pace. Id. At §§ 404.1520a(c)(3), 416.920a(c)(3).  Plaintiff avers that the ALJ failed to identify specifically what these limitations were (Pl.'s Br. at 14), but he is mistaken.

36

The ALJ determined that Plaintiff's affective disorder had caused no episode of decompensation during the relevant time period, which was the period since his alleged disability onset date of March 31, 2003 (Tr. 151), and no more than a mild restriction in the remaining 3 functional areas (Tr. 17-18)... this showed his affective disorder was not a severe impairment, especially given the absence of evidence to the contrary. See <u>id</u>. at §§ 404.1520a(d)(1), 416.920a(d)(1)(2008). Accordingly, the ALJ properly determined that Plaintiff's affective disorder was not a severe impairment (Tr. 17). See <u>id</u>.  But even though the ALJ found Plaintiff's affective disorder was non-severe, the ALJ considered its "effect" on Plaintiff's RFC, contrary to what Plaintiff avers (Pl.'s Br. at 14-17).  The ALJ explained that in assessing Plaintiff's RFC, he considered all of Plaintiff's impairments, including those that were not severe (Tr. 15, 19).  Given Plaintiff's functioning in the aforementioned broad functional areas, the ALJ determined that Plaintiff's affective disorder and other impairments non-exertionally limited him to performing a wide-range of routine repetitive tasks (Tr. 19). Substantial evidence supports the ALJ's RFC determination.

(Def.'s Br. at 11-12.)

With regard to Claimant's mental impairments, the ALJ made these findings:

The medical evidence establishes a medically determinable mental impairment that may not precisely meet the diagnostic criteria for a syndrome described in section 12.04, *affective disorders*. During the relevant time period the claimant has been under the care of psychiatrist Dr. M. K. Hasan at the New River Health Association clinic.  The claimant's primary treating diagnosis has consistently been a major affective disorder of mixed affect state, but it has evolved from being "bipolar in nature," to being "possibly bipolar in nature," to simply major depression, recurrent.  The claimant has been maintained continually on Tegretol, Lithium, and Ativan.  He has been prescribed another antipsychotic medication such as Seroquel or Geodon at times.  He is currently being prescribed on an antidepressant, Cymbalta, too.  In addition to medication, the claimant sees a counselor on an as needed

37

basis.  But no records of counseling during the relevant
time period were submitted.  The claimant's affective
disorder does not constitute a severe impairment.  The
severity of a claimant's mental impairment is assessed
according to the degree of functional limitation
resulting in four areas-activities of daily living;
social functioning; concentration, persistence or pace;
and episodes of decompensation of extended duration
(e.g., hospitalizations or other exacerbations of
symptoms accompanied by loss of adaptive
functioning)(paragraph "B" criteria of the mental
listings).  When a claimant is no more than mildly
limited in the first three areas and has no limitation in
the fourth, his mental impairment is generally considered
not to be severe in the absence of other evidence to the
contrary (20 CFR 404.1520a(d) and 416.920a(d)).

The claimant testified to a level of activity that is
significantly limited by psychological symptoms,
particularly mood swings, difficulty controlling his
anger, antisocial personality traits, obsessive
compulsive behaviors, anhedonia, and social withdrawal.
The medical evidence does not fully support symptoms of
the nature or the severity alleged.  According to Dr.
Hasan's treatment notes, the claimant's mood has
consistently been stable, and there has been no evidence
of psychosis or thought disorder.  The claimant's anxiety
is well controlled.  Dr. Hasan consistently observed
normal psychomotor behavior and normal rate and volume of
speech.  The claimant has a history of arrests and
convictions for crimes against persons and property.  But
Dr. Hasan has not diagnosed an antisocial personality or
any personality disorder or traits.  The treatment record
does not show that the claimant has been having
difficulty controlling anger or experiencing obsessive
compulsive behaviors.

The disparity between the symptoms alleged and verified
by the medical record compromise the credibility of the
claimant's allegations.  In particular, in November 2005,
the claimant told his primary care provider that he was
experiencing bad thoughts and feelings and hearing
command voices.  The claimant had only recently seen his
psychiatrist, and his next scheduled visit was a month
away.  The primary care provider declined to adjust the
claimant's psychotropic medications.  Despite the
severity of the psychological symptoms that the claimant
was describing, the claimant did not see Dr. Hasan any

38

sooner than originally scheduled.   According to Dr.
Hasan's notes of the follow up visit, the claimant said
that he had been doing "fairly well" since the last visit
and, "There has been no evidence of psychosis or thought
disorder."   The subsequent treatment record shows that
the claimant repeatedly said that he was doing well and
did not have any complaints except for pain.  (Exhibits
7F and B10F.)

In activities of daily living, the claimant had mild
restriction.  The claimant lives with his mother and her
boyfriend.  He is independent in the conduct of his daily
activities.   He takes care of his personal needs and
grooming without evidence of deterioration.  The claimant
can drive a car and travel alone.   The claimant alleges
that he has lost interest in doing anything, but his own
self-reports belie anhedonia to that degree.   The
claimant testified that he makes a minimal contribution
to maintaining the home: he does his own laundry, sweeps
the floor several times a week, and helps his mother
bring the groceries into the house from the car.   The
claimant denied helping his mother do the shopping.
However, in a report of his daily activities filed with
his request for reconsideration, the claimant said that
he did light household chores to help his mother and did
grocery shopping (Exhibit B10E).  Six months earlier the
claimant had told Dr. Hasan that his mother suffers from
blackout spells and cerebral atrophy and that he was
"taking care of her" (Exhibit B7F, p. 11).  The claimant
testified that he does not have any hobbies or interests.
But the claimant reported earlier that he reads the
newspaper regularly and enjoys discussing the news.  He
takes care of his pet dogs and fish and feeds the birds.
When asked about his hobbies, the claimant indicated that
he watches television a lot and can play the harmonica
very well.

In social functioning, the claimant has mild
difficulties.  The claimant gets along with his mother
and her boyfriend.  He socializes informally with a
neighbor a couple of days a week.  And he keeps medical
appointments.  But the claimant denies any other social
activity.  The claimant says that he does not like to e
around people and describes himself as a hermit.  The
claimant may be financially constrained from enjoying
more social outings.  The medical evidence, however, does
not show that the claimant's social activity is limited
to this degree by psychological symptoms.  Dr. Hasan's

treatment notes consistently describe the claimant as
cooperative, relevant, and maintaining good eye contact.
The claimant was polite and communicated effectively and
spontaneously.

With regard to concentration, persistence or pace, the
claimant has mild difficulties.  The claimant alleges
that he cannot maintain attention for more than a couple
of minutes and needs to be reminded of instructions.  The
claimant's daily activities show that he can maintain
attention sufficiently to drive a car, do shopping, and
complete household chores such as laundry.  Dr. Hasan did
not formally evaluate the claimant's attention and
concentration but opined that the claimant would be
capable of handling his own financial affairs if awarded
benefits.

The claimant has attempted suicide several times since
childhood.  But the record does not document any suicide
attempts or any hospitalizations or need for crisis
stabilization during the relevant time period.

The undersigned considered but cannot give any weight to
the Medical Source Statement of Ability to Do Work-
Related Activities (Mental) that Dr. Hasan completed in
June 2006 (Exhibit B7F)...Limitations of the severity
assessed are not supported by Dr. Hasan's clinical
findings, and the assessment was not accompanied by any
rationale other than a reference to the psychiatrist's
progress notes.  In determining the nature and severity
of the claimant's mental impairment, the undersigned
adopts the opinions of the state agency psychological
consultant, which are well supported by the medical
evidence and consistent with the record as a whole
(Exhibit B8F).

(Tr. at 16-18.)

At steps four and five of the sequential analysis, the ALJ must

determine the claimant's residual functional capacity ("RFC") for

substantial gainful activity.  "RFC represents the most that an

individual can do despite his or her limitations or restrictions."

See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).

Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ's decision must fully comply with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not

41

> "severe." While a "not severe" impairment(s) standing
> alone may not significantly limit an individual's ability
> to do basic work activities, it may--when considered with
> limitations or restrictions due to other impairments--be
> critical to the outcome of a claim.  For example, in
> combination with limitations imposed by an individual's
> other impairments, the limitations due to such a "not
> severe" impairment may prevent an individual from
> performing past relevant work or may narrow the range of
> other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

As cited by the Commissioner, the ALJ properly considered the

effect of Claimant's non-severe affective disorder on his RFC in

pages 3 through 7 of the Decision.  (Def.'s Br. at 12; Tr. at 15-

19.)  Additionally, the ALJ stated that he

> considered all symptoms and that extent to which these
> symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence, based
> on the requirements of 20 CFR 404.1529 and 416.929 and
> SSRs 96-4p and 96-7p... (and) considered opinion evidence
> in accordance with the requirements of 20 CFR 404.1527
> and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p...By
> earlier self-reports, given prescribed medications, the
> claimant has been getting six to ten hours of sleep a
> night, as well as napping regularly during the day.
> Treatment records show that the claimant was advised of
> the side-effects of medications but do not verify that
> the claimant complained of the medications making him
> drowsy.  The claimant has been on a fairly stable regimen
> of psychotropic medications throughout the relevant time
> period, during which he was repeatedly advised by his
> primary care provider to reduce the amount of heavy work
> that he was doing for the benefit of his musculoskeletal
> conditions.  The claimant has acknowledged doing light
> household chores, at most (Exhibits B6E and B10E and
> testimony).

(Tr. at 20-22.)

The undersigned has carefully reviewed the ALJ's decision and

finds that the ALJ's RFC assessment contains the requisite

42

narrative discussion regarding Claimant's affective disorder and its effect on his residual functional capacity to perform work when the Decision is read in its entirety and includes the "severe impairments" assessment.  (Tr. at 16-25.)   The ALJ's discussion clearly shows that at the time of the decision, Claimant's affective disorder was stabilized on medications.   Additionally, the ALJ's hypotheticals to the vocational expert ("VE") during the February 13, 2007, hearing show his consideration of Claimant's affective disorder.  (Tr. at 673-82.)  For instance, the ALJ asks the VE in his first hypothetical to consider an individual "limited to routine repetitive tasks involving only incidental public contact, no face to face contact with the public.  And no close team work with co-workers to achieve a job task."  (Tr. at 673.)  In another hypothetical, the ALJ asks the VE to consider "now the claimant's testified that basically he's been totally isolated for the last five years because of his situation and his symptoms.  If the claimant is incapable of interacting appropriately not only with the public, co-workers and supervisors, would that preclude all work?"  (Tr. at 679.)

Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment meets the requirements of SSR 96-8p and is supported by substantial evidence of record.

## Evaluating Opinions of Treating Sources

Claimant next asserts that the ALJ failed to give proper

weight to the treating physician's opinion regarding Claimant's functional capacity. (Pl.'s Br. at 14-16.) Specifically, Claimant states:

> The ALJ does not have the power to discount the functional conclusions of examining or treating physicians on the basis that such conclusions are not supported by clinical findings because he does not "possess" any medical "expertise"...The ALJ's decision fails to give substantial weight to the opinion of Dr. Hasan whose opinion is supported by his opportunity to examine and treat the plaintiff on numerous occasions and by appropriate clinical findings without any explanation beyond a statement that "they are not supported by his own clinical notes" without citing any examples which support his conclusion. We are left to speculate as to his reason.
>
> (Pl.'s Br. at 14-16.)

The Commissioner responds that Claimant's assertion has no merit because the ALJ complied with the regulations when he weighed Dr. Hasan's opinion. Specifically, the Commissioner argues:

> Plaintiff avers that the ALJ erred in disregarding Dr. Hasan's opinion (Pl.'s Br. at 14). The ALJ considered Dr. Hasan's opinion but determined that he could not give it any weight... The ALJ acknowledged that a treating source opinion was generally given greater weight, but correctly noted that the weight to which it was entitled depended on the same factors by which all medical source opinions were judged. See 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6) (2008) (Tr. 18)...
>
> Plaintiff suggests that the ALJ did not have the "medical expertise" to weigh the opinion evidence (Pl.'s Br. at 14), but it was the ALJ who was responsible for weighing Dr. Hasan's opinion... The ALJ determined that he could not give "any" weight to Dr. Hasan's opinion because it was unaccompanied by any rationale, rather than a reference to his progress notes (Tr. at 555-56), and the clinical findings reported in these same treatment records did not support the limitations that were assessed (Tr. at 18)...Plaintiff avers that the ALJ

failed to explain why he found Dr. Hasan's opinion was inconsistent with his progress notes (Pl.'s Br. at 16). On the contrary, as discussed above, the ALJ considered (Tr. 17), for example, that Plaintiff's mood was stable since he began treatment with Dr. Hasan...and there was no evidence that he had a thought disorder... Moreover, the ALJ cited cogent conflicting evidence (Tr. 18), such as the opinions of Drs. Saar (Tr. 533-46) and Harlow (Tr. 585-98), who had reviewed Plaintiff's case in May and August 2006, respectively... The State agency's medical consultants, like Drs. Saar and Harlow, are considered "highly qualified" psychologists who are also "experts" in Social Security disability evaluation.

(Def.'s Br. at 19-21.)

With regard to the weight given to Claimant's treating source opinion, the ALJ made these findings:

The undersigned considered but cannot give any weight to the Medical Source Statement of Ability to Do Work-Related Activities (Mental) that Dr. Hasan completed in June 2006 (Exhibit B7F). A treating source opinion is generally given great weight, but the weight to which it is entitled depends on the same factors by which all medical source opinions are judged. To be entitled to controlling weight, a treating source opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. (20 CFR 404.1527 and 416.927 and Social Security Rulings 96-5p.) Limitations of the severity assessed are not supported by Dr. Hasan's clinical findings, and the assessment was not accompanied by any rationale other than a reference to the psychiatrist's progress notes. In determining the nature and severity of the claimant's mental impairment, the undersigned adopts the opinions of the state agency psychological consultant, which are well supported by the medical evidence and consistent with the record as a whole (Exhibit B8F).

(Tr. at 18.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a

treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. § 404.1527(d)(2) (2006).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2006).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) (2006).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  However, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more

46

consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

The undersigned has thoroughly reviewed all the medical records, and finds that the ALJ fully and correctly considered Dr. Hasan's opinions, as well as those of the consultative examining physicians and the state agency record-reviewing medical sources of

record in determining Claimant's mental status regarding affective disorder.  As noted by the Commissioner, Drs. Saar (Tr. 533-46) and Harlow (Tr. 585-98), who reviewed Claimant's case in May and August 2006, respectively, agreed that Claimant's mental impairment was not severe.  The State agency's medical consultants, Drs. Clark (Tr. 435-47) and Harlow (Tr. 585-97), who reviewed Claimant's case in December 2003 and August 2006, respectively, also found Claimant's mental impairment was not severe.

As stated earlier, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2006).

The undersigned **FINDS** that the ALJ did consider the evidence of record from Dr. Hasan and weighed his opinions in keeping with the applicable regulations.

**Evidence Submitted to Appeals Council**

In Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Appeals Council incorporated into the administrative record a letter submitted with the request for review in which Wilkins' treating physician offered his opinion concerning the onset date of her depression. Id. at 96. The Wilkins court decided it was required to consider the physician's letter in determining whether

substantial evidence supported the ALJ's findings. <u>Id.</u> The Fourth
Circuit stated:

> "Reviewing courts are restricted to the administrative
> record in performing their limited function of
> determining whether the Secretary's decision is supported
> by substantial evidence." *Huckabee v. Richardson*, 468
> F.2d 1380, 1381 (4th Cir. 1972); *see* 42 U.S.C.A. §
> 405(g). The Appeals Council specifically incorporated Dr.
> Liu's letter of June 16, 1988 into the administrative
> record. Thus, we must review the record as a whole,
> including the new evidence, in order to determine whether
> substantial evidence supports the Secretary's findings.

<u>Id.</u> Under <u>Wilkins</u>, the court must review the record as a whole,
including the new evidence submitted to the Appeals Council, in
order to determine whether the ALJ's decision is supported by
substantial evidence.

On November 14, 2008, Claimant's representative enclosed to
the Appeals Council progress notes from New River Health
Association covering the period from June 10, 2008 through October
6, 2008. (Tr. at 5-8, 634-43.) Additionally, counsel submitted to
the Appeals Counsel progress notes from New River Health
Association covering the period from April 22, 2008 through May 30,
2008, and records from Beckley - Appalachian Regional Healthcare
Hospital [BARH] dated April 30, 2008 through May 5, 2008. (Tr. at
5-8, 619-30.)

These records were previously described in the record section
of this Memorandum Opinion and clearly show a deterioration in
Claimant's mental health condition. Records indicate Claimant was
transported to the emergency room of BARH on April 30, 2008, after

49

carving 720 into his left arm and putting a plastic bag over his
head.  (Tr. at 624.)  Although Claimant stated that it was not a
suicide attempt, but a "plea for help", these are not the actions
of a mentally stable individual.  Dr. Hasan, Claimant's treating
psychiatrist and the psychiatrist on call at the hospital, assessed
Claimant's condition as "Axis I - Major depression, recurrent,
moderate to severe with psychotic features; Axis II - Personality
disorder, not otherwise specified."  (Tr. at 626.)  Additional
notes transcribed from Dr. Hasan on May 2, 2008, indicate:

> He was brought to the emergency room as he put a plastic
> bag over his head to get his medication.  The family says
> that he has been taking pain pills, which he denies, in
> the past.  He refuses to take medication at times and
> refuses to drink and said, "Water is poison."  He is
> hallucinating and hearing voices telling him to hurt
> himself.  He is extremely depressed and despondent and a
> sense of helplessness was prevailing.

(Tr. at 627.)

Progress notes from New River Health Association Clinic dated
July 11, 2008, July 25, 2008, September 2, 2008, September 18,
2008, and October 6, 2008, show Claimant having inappropriate
emotional outbursts and seemingly uncontrolled psychological
behavior. (Tr. at 636-42.)

The Appeals Council is not required to provide an in depth
explanation for its decision that the additional evidence offered
by Claimant does not warrant a change in the ALJ's decision.  In an
unpublished opinion, the United States Court of Appeals for the
Fourth Circuit, noting Eighth Circuit precedent, rejected the

notion that the Appeals Council must articulate its own assessment of additional evidence.  Hollar v. Commissioner of Social Sec. Admin., 194 F.3d 1304, 1304 (4th Cir. 1999), cert. denied, 530 U.S. 1219, reh'g denied, 530 U.S. 1291 (2000) (citing Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992)); cf., Harmon v. Apfel, 103 F. Supp.2d 869, 872-73 (D. S.C. 2000) (court declined to follow Hollar and instead, required that the Appeals Council articulate its reasons for rejecting new, additional evidence).  Instead, the court, relying on Browning and the fact that the regulations addressing additional evidence do not direct the Appeals Council to announce detailed reasons for finding that the evidence does not warrant a change in the ALJ's decision, determined that the Appeals Council's explanation was sufficient.  20 C.F.R. § 404.970(b) (2001).  As in Hollar, the Appeals Council in this case did not err in failing to provide a more in depth explanation as to its decision.

The Appeals Council specifically incorporated the new evidence into the administrative record.  As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence.  Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991).

In considering Claimant's request for remand, the court notes initially that the social security regulations allow two types of

51

remand.  Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).  Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g), based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[1]  In Borders, the Fourth Circuit held that newly discovered

---

[1] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in Borders provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in Wilkins v. Secretary of Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to

evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

The undersigned notes that Claimant discussed the additional evidence presented to the Appeals Council in the "Brief in Support of Judgment on the Pleadings" but did not argue for a remand based on the evidence.  (Pl.'s Br. at 6-7, 15-18.)  It is also noted that the Commissioner provided no comment on the additional evidence presented to the Appeals Council.  (Def.'s Br. at 1-21.)  It is further noted that while the subject ALJ Decision did not

---

incorporate such evidence into the record in a prior proceeding."  However, Borders has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that Borders' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent Borders inquiry.

Brock v. Secretary, Health and Human Servs., 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

find Claimant to have a severe mental impairment, the previous ALJ Decision dated October 28, 2005, also denying disability benefits, did find Claimant to have severe impairments of affective disorder and personality disorder.  (Tr. at 29-36.)

The undersigned **FINDS** that remand is appropriate pursuant to the sixth sentence for consideration of new evidence concerning Claimant's mental impairment.  As noted above, the ALJ did not consider Claimant's affective disorder to be a severe impairment, the court believes that this new evidence may cause the Commissioner's decision to be different.  The court further finds that the new evidence was not available to Claimant at the time of the hearing; thus there is good cause for the evidence not having been presented before.

After a careful consideration of the evidence of record, the court **FINDS** that the Commissioner's decision is not supported by substantial evidence.  Accordingly, by Judgment Order entered this day, this matter is **REVERSED** and **REMANDED** for further administrative proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g) and the Clerk of this court is directed to transfer this case to the inactive docket of this court.

The Clerk is directed to transmit copies of this Order to all counsel of record.

ENTER: March 18, 2010

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge