IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

STEVEN BOLIN,

      Plaintiff,

v.                            CASE NO. 2:09-cv-00117

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  This case is presently pending before the court on briefs in support of judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Steven Bolin (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 28, 2006, alleging disability as of March 1, 2003, due to broken back, bipolar, migraines, antisocial, obsessive compulsive disorder (OCD), suicidal, sleeping problems, arthritis in knees, back and neck, hiatal hernia, gastroesophageal reflux disease (GERD), mood swings with poor concentration, shoulder pain and back pain.  (Tr.

at 13, 148-50, 151-53, 287-92, 306-311.)   The claims were denied
initially and upon reconsideration.   (Tr. at 13, 92-96, 97-101,
106-08, 109-11.)   On August 25, 2006, Claimant requested a hearing
before an Administrative Law Judge ("ALJ").   (Tr. at 112.)   The
hearing was held on February 13, 2007, before the Honorable
Theodore Burock.   (Tr. at 113, 644-82.)   By decision dated
September 10, 2007, the ALJ determined that Claimant was not
entitled to benefits.  (Tr. at 13-25, .)  The ALJ's decision became
the final decision of the Commissioner on January 30, 2009, when
the Appeals Council denied Claimant's request for review.  (Tr. at
5-8.)  On February 10, 2009, Claimant brought the present action
seeking judicial review of the administrative decision pursuant to
42 U.S.C. § 405(g).

    Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a
claimant for disability benefits has the burden of proving a
disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the "inability to engage in any
substantial  gainful  activity  by  reason  of  any  medically
determinable  impairment  which  can  be  expected  to  last  for  a
continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).

    The Social Security Regulations establish a "sequential
evaluation" for the adjudication of disability claims.  20 C.F.R.
§§ 404.1520, 416.920 (2002).   If an individual is found "not

2

disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

3

perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.)  Under the second inquiry, the ALJ found that Claimant has severe impairments of his neck, back, left shoulder, and reflux disease secondary to a hiatal hernia.  (Tr. at 16-18.)  The ALJ found that Claimant's mental impairment was not severe.  <u>Id</u>.  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 18-19.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 19-23.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 23-24.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as furniture assembler and production or labor/material handling, which exist in significant numbers in the national economy.  (Tr. at 24-25.)  On this basis, benefits were denied. (Tr. at 25.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial

evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that due to the submission of new, relevant, and material evidence, a sixth sentence remand is necessary.

<u>Claimant's Background</u>

Claimant was forty-four years old at the time of the administrative hearing. (Tr. at 649.)   He has a high school education.   He completed the tenth grade and obtained a GED in approximately 1981. (Tr. at 651.)   In the past, he worked as a laborer, shift leader, and trainer for a trucking company, a

plastic die-machine operator, and a dishwasher.   (Tr. at 652, 669-73.)

## The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize the psychiatric evidence below, as it is the only evidence in contention in the subject sixth sentence remand.

## Psychiatric Evidence

Records from the District Court of Iowa, Des Moines County, dated May 28, 2002, state that Claimant left a suicide note before injecting himself with air.  (Tr. at 333-41.)   Additional records indicate Claimant was admitted to the psychiatric ward through the Emergency Department of the Great River Medical Center, West Burlington, Iowa, on May 28, 2002 and discharged on June 4, 2002. (Tr. at 502-17.)   Claimant underwent a court ordered psychiatric evaluation on June 3, 2002, wherein it was determined that Claimant did not require court ordered treatment.   The evaluating physician recommended that Claimant undergo outpatient psychiatric services without court supervision.   (Tr. at 342-45.)

On July 23, 2002, Claimant underwent a psychiatric evaluation by Ayman Hanna, M.D. of Touchstone Behavior Counseling.   Dr. Hanna stated:

> **HISTORY OF PRESENT ILLNESS:** The pt. [patient] has a history of depression of about six years.   He was taking Celexa 60 mg. once a day which seems to help his depression.   Lately the pt. has been getting into brief

6

periods for one week at a time of irritability, hyperactivity and racing thoughts which interfere with his function and level. But the pt. would be able to keep his job up. Last time that the pt. had such an episode was about four weeks ago. Finally the pt. decided to come to seek help for this irritability...
**IMPRESSION:** The pt. has described hypomanic episodes when he gets into that irritability and rapid speech and hyperactivities and not being able to sleep. His temper gets out of control during these episodes. Later on the patient goes deeper in depression. It seems that the pt. suffers from bipolar II disorder...We will start the pt. on Depakote 500 mg po BID and continue Celexa and we will see the pt. in three weeks for re-evaluation of medications and his mood.

(Tr. at 499-500.)

Treatment update notes from Dr. Hanna are dated August 15, 2002, September 17, 2002, October 15, 2002, November 5, 2002, December 3, 2002, January 2, 2003, January 28, 2003, February 25, 2003, and April 22, 2003. (Tr. at 490-98.) The notes describe medication management, ongoing marital issues, and anger management problems. (Tr. at 490-98.) The notes dated January 28, 2003 state: "Patient was fired from his job at Ryan's because he refused to do all the dishes by hand because the dishwasher was broken. Patient also has been having problems with his wife...and his wife asked him to move out." (Tr. at 492.) The notes dated April 22, 2003 state:

He requested medications because he is moving to West Virginia. He was disheveled, was tearful and described his mood as depressed and stressed out. Denies suicidal or homicidal ideations. No delusion was elicited. Has good insight and judgment. The pt. got into a verbal altercation with his wife and she kicked him out of the house...The pt. is planning to move to stay with his mother in West Virginia.

7

(Tr. at 490.)

A form report titled "West Virginia Department of Health and Human Resources General Physical (Adults)" is dated June 13, 2003 and signed by Tammy Campbell.  In response to the question "Is applicant able to work full time at customary occupation or like work?", Ms. Campbell states:

> I do not have enough information (records) on patient to determine this...certainly this gentleman's medical records relating to his neck and back need to be reviewed and possibly reevaluated.  His psychological records also need to be reviewed.  Bipolar disorder is treatable - very successfully in many people.  He is young enough to be rehabilitated.  He has a variety of experiences also that may serve him well now.

(Tr. at 393.)

The record contains thirty-four progress notes from New River Family Health Center dated June 13, 2003 to October 20, 2005. Although many of the handwritten reports are illegible, the legible records indicate Claimant was treated for bipolar disorder, depression, and anxiety.  (Tr. at 327-32, 347-75, 381-409.)

On July 16, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe.  (Tr. at 469.)  The evaluator, Robert Soloman, Ed.D., based his opinions upon the medical disposition category of Affective Disorders.  (Tr. at 469.)  Dr. Soloman noted that Claimant's affective disorder was bipolar disorder.  (Tr. at 472.) Dr. Soloman opined that Claimant had a mild degree of limitation in difficulties in maintaining social functioning and maintaining

8

concentration, persistence, or pace, no degree of limitation in restriction of activities of daily living, and no episodes of decompensation.  (Tr. at 479.)   He found no evidence to establish the presence of the "C" criteria.  (Tr. at 480.)

On July 16, 2003, Kelly Rush, M.A., Supervised Psychologist, and Dale M. Rice, M.A., Licensed Psychologist, provided a Psychological Evaluation of Claimant.   (Tr. at 484-88.)  The psychologists noted that Claimant was unemployed and recently quit his job as a dishwasher operator because "I didn't want to do dishes by hand cause the washer broke."  (Tr. at 485.) They further noted Claimant's history of one arrest for burglary and one arrest for child molestation.  (Tr. at 486.) [*Note*: During re-examination by the ALJ, Claimant stated that he served two and one-half years on each charge.  (Tr. at 667-68.)]   Their findings were:

> **MENTAL STATUS EXAMINATION**
> **Orientation** - He was alert throughout the evaluation.  He was oriented to person, place, time and date.
> **Mood** - Observed mood was euthymic.
> **Affect** - Affect was broad and reactive.
> **Thought Processes** - Thought processes appeared logical and coherent.
> **Perceptual** - He reports no unusual perceptual experiences.
> **Insight** - Insight was fair.
> **Judgment** - Within normal limits based on his responses to the finding the letter question.  He stated "mail it."
> **Suicidal/Homicidal Ideation** - He reports a history of five suicidal attempts in which he overdosed on medication and "pumping air in my veins."  His last attempt was in 2001.   He denies current suicidal ideation.  He denies homicidal ideation.
> **Immediate Memory** - Immediate memory was within normal limits.  He immediately recalled 4 of 4 items.
> **Recent Memory** - Recent memory was within normal limits.

He recalled 3 of 4 items after 30 minutes.
**Remote Memory** - Remote memory was within normal limits based on ability to provide background information.
**Concentration** - Concentration was within normal limits based on his ability to do serial 3's.
**Psychomotor Behavior** - Normal.

## DIAGNOSTIC IMPRESSION
AXIS I:   296.80    Bipolar Disorder NOS
AXIS II:  301.9     Personality Disorder NOS
AXIS III: By self report: back and neck problems, GERD
          and migraines

### RATIONALE
Mr. Bolin was given the diagnosis of Bipolar Disorder NOS based on the following criteria: episodes characterized by depressed mood, increase in weight, crying spells, feelings of worthlessness and hopelessness, sleep difficulty and difficulty concentrating.  He reports an episode will last one to two days.  He also reports episodes characterized by racing thoughts, excessive energy, a decreased need for sleep and pressured speech. He reports an episode will last approximately three days. He does not meet criteria for any specific Bipolar Disorder due to rapid alteration.  It appears that Mr. Bolin has long standing deficits in his personality which do not necessarily meet criteria for any specific personality disorder.  Therefore, a diagnosis of Personality Disorder NOS is given.

## DAILY ACTIVITIES
**Typical Day:** Mr. Bolin goes to bed at 10:00 pm and gets up at 9:00 am.  He gets up, drinks coffee, smokes, plays on the computer, visits with his mother and her boyfriend, listens to the radio, watches tv, eats, plays on the computer, watches tv, eats, watches tv, take his medicine, showers and goes to bed.
**Activities:**
**Daily** - takes medicine, drinks coffee, smokes, plays on the computer, listens to the radio, watches tv, eats, visits with family, showers and goes to bed
**Weekly** - sweeps the floors, goes to the grocery store and mows the lawn
**Monthly** - goes to the doctor
**Hobbies/Interests:** playing the harmonica and woodworking
### SOCIAL FUNCTIONING
During the evaluation, social functioning was within normal limits based on his interaction with the examiner.

**CONCENTRATION**
Attention/concentration were within normal limits based
on his ability to do serial 3's.
**PERSISTENCE**
Persistence was within normal limits.
**PACE**
Pace was within normal limits based on the mental status
examination.
**CAPABILITY TO MANAGE BENEFITS**
Mr. Bolin appears capable to manage any benefits he might
receive.
**PROGNOSIS**: Fair.

(Tr. at 486-88.)

On December 10, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe. (Tr. at 435, 447.) The evaluator, H. Hoback Clark, M.D., based her opinions upon the medical disposition categories of Affective Disorders and Personality Disorders. (Tr. at 435.) Dr. Clark noted that Claimant's affective disorder was bipolar syndrome. (Tr. at 438.) She further noted "Personality Disorder NOS [not otherwise specified]." (Tr. at 442.) Dr. Clark opined that Claimant had a mild degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 445.)

On January 8, 2004, Maurice Prunt, Ph.D., stated in two forms titled "Medical Consultant's Review of Mental Residual Functional Capacity Assessment" and "Medical Consultant's Review of Psychiatric Review Technique Form" that he agreed that the December 10, 2003 medical consultant's conclusions were reasonable and

11

supported by the evidence in file.   (Tr. at 431-34.)

An MRI of the Claimant's brain, with and without contrast, was performed on May 21, 2004, at Raleigh General Hospital at the request of Dr. Othman.   (Tr. at 407.)   Andrew Goodwin, M.D., reported:

> MRI images of the brain were obtained.   Multiplanar, multisequence imagining was performed... Ventricles are normal in size, shape, and position.  There is no area of signal abnormality.  There is no evidence of mass effect. Images were obtained after gadolinium.   There is no evidence of enhancing lesion on the post gadolinium images.
>
> Impression: No abnormalities noted in the MRI images of the brain both without and with gadolinium administration.

(Tr. at 379.)

Progress notes from New River Family Health Center dated June 16, 2005 and August 18, 2005 are signed by M. K. Hasan, M.D.   The notes state that Claimant's "depression and anxiety are under much better control" and that Claimant was "alert and oriented" with "no evidence of psychosis or thought disorder."   (Tr. at 328-29.)

The most recent New River Family Health Center records, signed by Debra Moon, C-FNP [certified-family nurse practitioner], are dated October 20, 2005.   The notes state:

> S: This is a white male who is being followed by us due to bipolar disorder. He reports being somewhat depressed and irritable. Has not heard from the law judge regarding his disability.   States he was supposed to find out within 120 days but this time has lapsed.  He is in contact with his attorney.   He reports medication has been helping him and that his mood is more stable.

12

O:  Alert and oriented x3.  Neat, tidy, cooperative, and relevant.  His affect and mood seem to be appropriate.  He denies any suicidal ideation, hallucinations, or delusions.

TREATMENT PLAN: He is to continue Ativan 2 mg b.i.d., #55, Lithium 600 mg q.h.s.; Tegretol 400 b.i.d.; and Seroquel 50 q.a.m. and 100 q.h.s.  Effects and side effects of medication were discussed.  He is to RTC in two months or soon PRN.

(Tr. at 327, 572.)

A form report titled "West Virginia Department of Health and Human Resources General Physical (Adults)" is dated June 16, 2004 and signed by Linda Scarborough.  Although largely illegible, lines are checked indicating that Claimant is not able to work full-time and that his major diagnosis is "bipolar".  (Tr. at 377-78.)

On May 5, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's impairment was not severe.  (Tr. at 545.)  The evaluator, Timothy Saar, Ph.D., based his opinions upon the medical disposition category of Affective Disorders, bipolar.  (Tr. at 533, 536.)  Dr. Saar opined that Claimant had a mild degree of limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.  (Tr. at 543.) He found that the evidence does not establish the presence of the "C" criteria.  (Tr. at 544.)  He further noted: "Analysis; clmt [claimant] appears credible.  ALJ Decision reviewed and given controlling weight.  Tx [treating] source reports clmt is doing "fairly well."

13

All areas mildly limited.  Evidence does not support severe limitations.  Decision - Impairment not severe."  (Tr. at 545.)

On June 30, 2006, Dr. Hasan filled out a form titled "Medical Assessment of Ability to do Work-related Activities (Mental)." (Tr. at 554-56.)  The form indicates that Claimant has a "fair" ability to adjust to a job regarding "follow work rules", "use judgment", and "maintain attention/concentration"; a "poor" ability to adjust to a job regarding "relate to co-workers", "interact with supervisor(s)", "deal with work stresses", and "function independently"; and "none" ability to "deal with the public". (Tr. at 554.)  Dr. Hasan found Claimant to have a "good" ability to "understand, remember and carry out simple job instructions"; a "fair" ability to "understand, remember and carry out detailed, but not complex job instructions"; and a "poor" ability to "understand, remember and carry out complex job instructions."  (Tr. at 555.) The evaluator further found that Claimant had a "fair" ability to "maintain personal appearance", "behave in an emotionally stable manner", and "demonstrate reliability"; and "none" ability to "relate predictably in social situations." (Tr. at 555.)  Claimant was deemed able to manage benefits in his own best interest.  (Tr. at 556.)

Mental Health progress notes from Dr. Hasan of the New River Health Association, are dated April 28, 2005, June 16, 2005, August 18, 2005, December 8, 2005, February 9, 2006, May 11, 2006, June 8,

14

2006 and July 7, 2006.  (Tr. at 552-53; 558-59; 561, 566, 573-75.)
The initial note indicates: "The patient continues to do fairly
well.  Says his medications work well.  Moods are more stable.
Depression/anxiety more stable."  (Tr. at 575.)   The most recent
notes dated July 7, 2006 indicate:

> Subjective:  This is a 43 y/o [year old] male who was
> seen in followup.  Patient reports doing well and stable
> with current medications.  Patient reports no worsening
> of  psychiatric  symptoms.    Taking  medications  as
> prescribed and denies any side effects.  Sleeping and
> eating well.  Patient denies any suicidal or homicidal
> thoughts, hallucinations or delusions.
>
> Objective: Patient is unkempt, cooperative, and relevant.
> Casually dressed and appears stated age.  Maintains eye
> contact and oriented to time, place, and person.  Speech
> is of normal rate and volume.  Mood is stable.  Affect is
> euthymic.  Thoughts are logical with no indication of
> psychosis.  Psychomotor activity is normal.  Insight
> judgment is fair.
>
> Diagnoses: AXIS I: Major affective disorder, possibly
> bipolar in nature, mixed affective state; history of
> GERD; chronic pain syndrome...
>
> Medications: Geodon 60 mg at bedtime
> Tegretol 200 mg b.i.d.
> Ativan 2 mg b.i.d.
> Lithium carbonate in the form of Lithobid 600 mg at
> bedtime...
>
> Plan: Patient is currently stable with treatment.
> Patient encouraged involvement in a hobby, exercise
> routine, or church activity.  Effects and side effects of
> medications discussed.  To continue a biopsychosocial
> approach and refer for counseling as needed.  Patient to
> continue medications as listed above.  Patient advised to
> avoid all forms of illicit drugs and alcohol.  Compliance
> with above treatment was stressed. Patient to return in
> two months.  If any problems, call, return to clinic
> sooner, or go to BARH ER [Beckley Appalachian Regional
> Hospital Emergency Room].  The patient is advised to make
> sure that there are no guns in the house despite denial

of any suicidal or homicidal ideations.  Counseling with
his counselor needs to be continued.  He is competent to
handle his financial affairs if disability is granted for
which he applied.

(Tr. at 552.)

On August 3, 2006, a State agency medical source completed a
Psychiatric Review Technique form and opined Claimant's impairment
was not severe.  (Tr. at 585.)  The evaluator, Jeff Harlow, Ph.D.,
based his opinions upon the medical disposition category of
Affective Disorders.  (Tr. at 585.)  Dr. Harlow opined that
Claimant had a mild degree of limitations in restriction of
activities of daily living and in maintaining concentration,
persistence, or pace, with no difficulties in maintaining social
functioning and no episodes of decompensation.  (Tr. at 595.) He
found that the evidence does not establish the presence of the "C"
criteria.  (Tr. at 596.)  He further noted: "This claimant's
statements about functional capacities on the ADL form are
partially credible because they are inconsistent with clinical
findings of the treating source.  Clinical findings of the treating
source indicate that the mental impairments is (sic, are) not
severe."  (Tr. at 597.)

On August 31, 2006, Dr. Hasan reported that Claimant had been
at the clinic for a follow-up visit:

He stated that apart from pain, he is doing well...
Patient is neat, tidy, cooperative and relevant.
Casually dressed and appears the stated age.  Maintains
eye contact and oriented x 3.  Speech is of normal rate
and volume.  Mood is stable.  Affect euthymic.  Thoughts

16

are logical with no indication of psychosis.  Psychomotor
activity is normal.    Insight and judgment are
fair...Continue a biopsychosocial approach and counseling
as needed.  The patient advised to avoid all forms of
illicit drugs and alcohol.  Church, exercise and
calisthenics were recommended.  No homicidal or suicidal
ideations were entertained.  Compliance with treatment
was stressed.

(Tr. at 609-10.)

Additional Psychiatric Evidence Presented to the Appeals Council

On April 22, 2008, Sarah L. England, PA-C, psychiatry, New

River Health Association reported:

Patient comes in today talking a lot about his constant
pain, and not being able to sleep more than 3 hours a
night.  He states the pain makes him irritable and
difficult to get along with his family.  He does talk
about death if he does not receive his disability this
time around....Patient denies any suicidal or homicidal
ideations, hallucinations, or delusions.

(Tr. at 619.)

On April 30, 2008, Ms. England, PA-C, stated in a telephone

note:

Patient's mother called, whom he lives with, Patricia
Gordon, stating that this morning Steve came in and
kissed her on the head and told her good-bye, then
proceeded to lock himself in his bedroom.  An ambulance
was called to take him to BARH [Beckley Appalachian
Regional Hospital].  He was cutting on his arms.  Mother
reports that he carved 7-20 in his arm, and that is the
day his dad passed away, and also the day his sister was
killed by a drunk driver.  Mother is concerned about
Steve signing himself out AMA [against medical advice]
before getting treatment.  She will keep us informed of
the situation, and I will f/u [follow-up] with Steve
after discharge from BARH.

(Tr. at 620.)

Records from Beckley Appalachian Regional Hospital (BARH)

17

indicate that Claimant was admitted to the Psychiatry Department on April 30, 2008 after initially being seen in the ER:

> after superficial lacerations to his left arm and carving 720 in his left arm.  The patient has history of psychiatric treatment at New River Family Health.  He reports that this was not a suicide attempt, that he did this as a plea for help, stating, "I thought if I did this, they would bring me to the ER and give me a pain shot, and I could go back home." While he was in the ER, he was complaining that he could not get his medications as previously ordered, stating, "I wanted my medications, I had to get their attention, they wouldn't give me any, I put a plastic bag over my head and I got my pain pills." He said that he is here because his back hurts so bad and the only way that he can get to the hospital was to cut himself.  The patient denies any prescription drug abuse or street drug abuse, though his family reports that he does have problems with prescription drugs.  He is also found to be somewhat delusional, guarded, rambling in conversation, which is very circumstantial, stating that he is anti-social, the water is poisoned and complaining of hallucinations. He does admit to increase in depression recently.  He does have history of suicide attempts.  He carved 720 into his arm because he reports that is the time that his father died and his adopted daughter died. He is alert and oriented. He is somewhat attention seeking, with behaviors that are manipulative and are carried out for shock value.  He seems to have limited insight, judgment and impulse control.

(Tr. at 624.)

Although the records do not contain a discharge summary, a report from M. Khalid Hasan, M.D., with a transcription and dictation date of May 2, 2008, states:

> PSYCHIATRIC DIAGNOSES
> AXIS I
> Major depression, recurrent, moderate to moderately severe in nature with paranoid ideations.  Rule out schizoaffective.  Rule out substance abuse, denied by patient...
> RECOMMENDATIONS AND DISPOSITION

18

>At the time of discharge, he was on Lamictal 200 mg at
>bedtime and 100 mg in the morning; Lipitor 30 mg at
>bedtime; Protonix 40 mg daily; methocarbomol 750 mg
>b.i.d.; Geodon 40 mg b.i.d.; Prozac 40 mg once daily;
>diazepam 10 mg at bedtime. Followup with me, also at New
>River Clinic. Recommended following up family physician.
>He was given a course of antibiotics in the form of
>cephalexin, which were discontinued. Church,
>calisthenics and exercise also recommended. He was
>discharged with the above recommendations. The
>importance of outpatient treatment and compliance was
>stressed to him. Make sure there are no guns in the
>house. Other pain medications need to be continued from
>his pain physician, he is on Darvocet N 100 mg t.i.d.

(Tr. at 628-30.)

On May 15, 2008, Ms. England, PA-C, stated that Claimant is at

the clinic for a follow-up after his recent discharge from BARH:

>He reports doing fairly well. Still having problems
>sleeping... He carved 720 in his left forearm... he has
>been picking off the scabs and wants this to scar as a
>reminder. Today, there is pus coming from the wound. It
>is very erythematous with mild edema, hot to touch.
>Mother reports that he has not been putting anything on
>it... Plan: Patient is to decrease Geodon to one q.d. and
>finish what he has left. Rx for Vistaril 50 mg, 1-2 tabs
>PO q.h.s. If this does not help with his insomnia, will
>try to get Rozerem approved by Medicaid.

(Tr. at 621.)

On May 30, 2008, Ms. Jamie Settle, PA-C, New River Health

Association, reported that Claimant had returned to the clinic for

follow-up on his "multiple medical problems including

Hyperlipidemia, GERD, COPD [chronic obstructive pulmonary disease]

& psychiatric problems. He is still seeing Dr. Hasan for his

psychiatric care. He also has chronic pain but is willing to wean

himself off of the Darvocet. He is denying any new problems or

19

complaints at this time." (Tr. at 623.)

On June 10, 2008, Ms. England, PA-C, stated in a report:

> Patient reports doing fairly well. He's been working on
> getting his cholesterol down, and he has reduced it from
> 800's to 200's. He is decreasing his caffeine. Still
> having sleep problems. He's not getting any sunlight or
> exercise. He's frustrated about not getting any answer
> regarding his disability. His headaches have been
> decreased on the Verapamil...
> Mental Status: Alert & oriented x 3, in NAD. Patient is
> neat, tidy, cooperative, and relevant. Casually dressed
> and appears stated age. Maintains eye contact. Speech
> is of normal rate and volume. Mood is depressed. Affect
> euthymic. Thoughts are logical with no indication of
> psychosis. Psychomotor activity is normal. Insight and
> judgment are fair. Attention and concentration are good.
> Memory is intact. Patient denies any suicidal or
> homicidal ideations, hallucinations, or delusions.
> Psychiatric Diagnosis:
> Axis I: Bipolar disorder. Anxiety disorder. Chronic pain.
> Plan: Continue current medications. Side effects of
> medications were discussed. Continue a biophysical
> approach and refer for counseling as needed. Patient is
> advised to avoid all forms of illicit drugs, alcohol, and
> tobacco. Compliance with treatment stressed. RTC
> [return to clinic] in 4 weeks.

(Tr. at 634.)

On July 8, 2008, Ms. England, PA-C, stated in a progress

report that Claimant's mental status, psychiatric diagnosis, and

plan remained the same as in the previous report. She also noted:

> Patient reports he's doing about the same mentally. His
> pain is worse. He reports that the Darvocet he was on
> previously only helped him a small amount, and now he has
> no relief. He reports he does not believe in taking any
> type of NSAID [nonsteroidal anti-inflammatory drug].
> Appetite fluctuates. He reports that he continues to
> sleep during the day to stay away from his mom's
> boyfriend.

(Tr. at 635.)

20

On July 11, 2008, Ms. Settle, PA-C, stated in a progress note:

The patient presents to the clinic.  I have seen this
patient for a long time.  Ever since I have seen him, he
has had problems with chronic thoracic pain.  I have
tried multiple medications and multiple treatments for
him.  There have been a majority of times that he has
asked for narcotic medications, and I told him that I do
not feel comfortable giving him those.  He did have a
suicide attempt a couple of months back and admits that
this was not his first suicide attempt and that he had
another one about 25 years ago, and his first one was at
the age of 8 whenever he swallowed a bottle of pills.
The patient states that he has tried every type of
suicide except for the one sure fire way but states that
it is too messy.  When asked what he meant by this, he
said that he knew if he cut his carotid artery, that
would be a definite way to commit suicide.  The patient
states that he is just waiting for death but is not going
to commit suicide at this time. As soon as I entered the
examination room, I said hi to him and asked him how he
was doing.  He asked me if that was a rhetorical
question because he obviously thought that I do not care
because I am not giving him any pain medication to help
with his back pain.  He also told me to no longer address
him as Steven or Mr. Bolin and to address him as Mr. Hyde
because now he is Mr. Hyde from Jekyll and Hyde.  The
patient was very confrontational through the whole entire
examination and was easily irritated and agitated.  There
was also some obvious depression.  The patient got
aggravated and stated that he ended up "fucking himself
over" whenever he did that last suicide attempt.  He did
apologize for cursing but states that since then he knows
that he will not ever be able to get narcotic medications
from myself or any other New River provider.  The patient
also goes on to state that he has read an article in a
magazine stating that physicians have a tendency to lie
and twist the truth and that physicians usually do not
care about the well-being of the patient; they just care
about getting paid.  The patient is wanting to get on
disability and states that as soon as he does get on
disability, he is going to go see a real doctor so he can
get some medication for his pain.  I did tell the patient
that if he is not satisfied with his current care, he is
more than welcome to find another provider and I would
help him find somebody else if he is willing to do this;
and the patient states he wants to stay with me.  I also
told him that even though I cannot give him narcotic

21

medications due to his previous suicide attempt and the liability that it holds, there are other options of dealing with his chronic pain. I told him we could do trigger point release by Mariani Didyk, but the patient states that she does not like him and he hates her and stated, "I would rather knock her head off than see her." I told him that we could do physical therapy, but he stated that it does not work. I told him about osteopathic manipulation therapy that possibly Dr. Todd Berry could perform, and he is wiling to try this. I also told him that I could try him on a little bit of Ultram to help with the pain, and he states that nothing usually works for the pain. He has also even bought oxycodone and OxyContin off of the street, 10 mg of each one, and did not see any improvement in his pain. The patient is currently seeing Sarah England for his psychiatric care and is wanting to keep a followup appointment with her...

I did once again tell the patient that if he is not happy with his care here, he can transfer his care elsewhere and I would be more than happy to help him. But he is not wanting to do that at this time. The patient's confrontation level continues to worsen, and I am going to talk to another provider about possibly transferring care within New River Health to a different provider. The patient will be contacted if this does happen. DHHR physical form was filled out and will be sent to DHHR.

(Tr. at 636-37.)

On July 25, 2008, Phillip Todd Berry, D.O., New River Health Association, evaluated Claimant:

Patient was referred in for OMT [osteopathic manipulative therapy] for his back. Previously he had seen Jamie Settle and had a very disagreeable visit with her at last visit. He became quite uncooperative as well as being vulgar essentially demanding narcotic medication. At that time Jamie did refuse him and offered him OMT [osteopathic manipulative therapy]. He agreed to comply...I did start with an OA [occipitoatlantal, a region of the body located at the back of the skull] release as well as soft tissue release and stretching of the cervical spine as well as the head. Patient seemed to tolerate this well. Then we did a leg tug on the left with a OB roll and patient responded well to this with

22

some relief.  Then performed soft tissue release of the thoracic, lumbar and sacral spine as well as prone HVLA [high-velocity, low amplitude] to the dorsal spine.  Knee to chest stretching was performed and patient was instructed on how to complete these at home on a twice daily basis.  Also at this time I did recommended that the patient use ice packs 15 minutes out of every hour for a period of 4 hours as well as Motrin over-the-counter for inflammation.  I have also offered him physical therapy as well as a trigger point injection.  The patient declines this at the current time.  He repeatedly asks is this all we are going to do for my pain.  My reply to this was yes.  I told the patient that he may return for further OMT therapy if he felt this was helpful.  It is noted that the patient's mood and demeanor changed dramatically at the end of the interview becoming agitated as he left the room.

(Tr. at 638.)

On September 2, 2008, Ms. England, PA-C, stated in a note:

Patient came in and slammed his Prozac prescription down on the table stating he cannot take it because he's on Tramadol.  He states he has been looking at WebMD along with other Internet sites, and he says this is contraindicated.  The patient states that the combination was giving him tremors and seizures.  He talks about how he wants to get out of Jim's house and how Jim constantly talks about sex.  The patient is very frustrated with his sleep and living situation, and the fact that he has not been awarded disability.  Patient also talks about how no one is helping him with his pain.  He is cursing quite frequently through this and frankly being very offensive...

Plan: Discussed at length with patient that I would not tolerate his offensive language and talking about other NRHA [New River Health Association] providers.  Explained to patient that he has gotten himself into the situation he is in and no medication is going to help until he starts to have a more positive outlook.  He also now has a medical card, and if he is not happy with the care he is receiving at NRHA, he may seek care outside of NRHA.  After this the patient calmed down quite dramatically and apologized over and over.  Stop Prozac.  Patient was given Risperdal 1 mg at bedtime x one week, and then 1 mg b.i.d.  Side effects of medications were discussed.

23

Continue a biophysical approach and refer for counseling
as needed... RTC in three weeks.  If there are any
problems in the interim, the patient will return to the
clinic sooner or go to BARH ER.

(Tr. at 640.)

On September 18, 2008, Ms. England, PA-C, stated in a progress

note:

Patient comes in today fairly upset.  He states that his
close friend is sick and only has a 20% chance of living.
He talks about that situation for a while and some
problems he's having at home.  He states he's not noticed
any change on the Risperdal, but today he was tearful,
also smiling, joking much more than usual, which is a
huge improvement, most of the time is angry.  He states
his mother is upstairs trying to figure out what is going
on with his Valium RX in the pharmacy.    I told the
patient that if he didn't get answers that I would help
him.  He needs labs today.

(Tr. at 641.)

On October 6, 2008, Ms. Settle, PA-C, stated in a note:

Patient presents to the Clinic.  He is here today for a
F/U [follow-up] on his multiple medical problems
including hyperlipidemia and chronic back pain.  He is
still seeing Sarah L. England, PA-C for his bipolar
disorder and does seem to be well-controlled on that.
Patient is finally willing to restart NSAIDs [Non-
Steroidal Anti-Inflammatory Drugs] for his back pain due
to increased pain.  He is also complaining of sinus pain
and pressure, nasal congestion, postnasal drainage, a
cough productive of yellow phlegm, and some SOB
[shortness of breath] and wheezing.  He is still smoking
and does not want to cut back at this time... He can do
his medical F/U with Sarah L. England, PA-C since I will
be leaving and he is agreeable to do this in three to
four months.

(Tr. at 642.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not

24

supported by substantial evidence because the ALJ failed to consider the effect of major affective disorder on Claimant's residual functional capacity to perform a wide range of light and sedentary work. (Pl.'s Br. at 14.) Claimant also argues that the ALJ erred in failing to give proper weight to the treating physician's opinion regarding Claimant's functional capacity. (Pl.'s Br. at 14-16.)

The Commissioner argues that the ALJ's finding that Claimant is not disabled is supported by substantial evidence and that the ALJ fully complied with the regulations when he assessed Claimant's mental condition and the treating physicians' opinions. (Def.'s Br. at 11-21.)

**Analysis of Psychiatric Impairments and RFC**

With regard to Claimant's mental impairments, the ALJ made these findings:

> The medical evidence establishes a medically determinable mental impairment that may not precisely meet the diagnostic criteria for a syndrome described in section 12.04, *affective disorders*. During the relevant time period the claimant has been under the care of psychiatrist Dr. M. K. Hasan at the New River Health Association clinic. The claimant's primary treating diagnosis has consistently been a major affective disorder of mixed affect state, but it has evolved from being "bipolar in nature," to being "possibly bipolar in nature," to simply major depression, recurrent. The claimant has been maintained continually on Tegretol, Lithium, and Ativan. He has been prescribed another antipsychotic medication such as Seroquel or Geodon at times. He is currently being prescribed on an antidepressant, Cymbalta, too. In addition to medication, the claimant sees a counselor on an as needed basis. But no records of counseling during the relevant time period were submitted. The claimant's affective disorder does not constitute a severe impairment. The

severity of a claimant's mental impairment is assessed according to the degree of functional limitation resulting in four areas-activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation of extended duration (e.g., hospitalizations or other exacerbations of symptoms accompanied by loss of adaptive functioning)(paragraph "B" criteria of the mental listings). When a claimant is no more than mildly limited in the first three areas and has no limitation in the fourth, his mental impairment is generally considered not to be severe in the absence of other evidence to the contrary (20 CFR 404.1520a(d) and 416.920a(d)).

The claimant testified to a level of activity that is significantly limited by psychological symptoms, particularly mood swings, difficulty controlling his anger, antisocial personality traits, obsessive compulsive behaviors, anhedonia, and social withdrawal. The medical evidence does not fully support symptoms of the nature or the severity alleged. According to Dr. Hasan's treatment notes, the claimant's mood has consistently been stable, and there has been no evidence of psychosis or thought disorder. The claimant's anxiety is well controlled. Dr. Hasan consistently observed normal psychomotor behavior and normal rate and volume of speech. The claimant has a history of arrests and convictions for crimes against persons and property. But Dr. Hasan has not diagnosed an antisocial personality or any personality disorder or traits. The treatment record does not show that the claimant has been having difficulty controlling anger or experiencing obsessive compulsive behaviors.

The disparity between the symptoms alleged and verified by the medical record compromise the credibility of the claimant's allegations. In particular, in November 2005, the claimant told his primary care provider that he was experiencing bad thoughts and feelings and hearing command voices. The claimant had only recently seen his psychiatrist, and his next scheduled visit was a month away. The primary care provider declined to adjust the claimant's psychotropic medications. Despite the severity of the psychological symptoms that the claimant was describing, the claimant did not see Dr. Hasan any sooner than originally scheduled. According to Dr. Hasan's notes of the follow up visit, the claimant said that he had been doing "fairly well" since the last visit

26

and, "There has been no evidence of psychosis or thought
disorder." The subsequent treatment record shows that
the claimant repeatedly said that he was doing well and
did not have any complaints except for pain. (Exhibits
7F and B10F.)

In activities of daily living, the claimant had mild
restriction. The claimant lives with his mother and her
boyfriend. He is independent in the conduct of his daily
activities. He takes care of his personal needs and
grooming without evidence of deterioration. The claimant
can drive a car and travel alone. The claimant alleges
that he has lost interest in doing anything, but his own
self-reports belie anhedonia to that degree. The
claimant testified that he makes a minimal contribution
to maintaining the home: he does his own laundry, sweeps
the floor several times a week, and helps his mother
bring the groceries into the house from the car. The
claimant denied helping his mother do the shopping.
However, in a report of his daily activities filed with
his request for reconsideration, the claimant said that
he did light household chores to help his mother and did
grocery shopping (Exhibit B10E). Six months earlier the
claimant had told Dr. Hasan that his mother suffers from
blackout spells and cerebral atrophy and that he was
"taking care of her" (Exhibit B7F, p. 11). The claimant
testified that he does not have any hobbies or interests.
But the claimant reported earlier that he reads the
newspaper regularly and enjoys discussing the news. He
takes care of his pet dogs and fish and feeds the birds.
When asked about his hobbies, the claimant indicated that
he watches television a lot and can play the harmonica
very well.

In social functioning, the claimant has mild
difficulties. The claimant gets along with his mother
and her boyfriend. He socializes informally with a
neighbor a couple of days a week. And he keeps medical
appointments. But the claimant denies any other social
activity. The claimant says that he does not like to e
around people and describes himself as a hermit. The
claimant may be financially constrained from enjoying
more social outings. The medical evidence, however, does
not show that the claimant's social activity is limited
to this degree by psychological symptoms. Dr. Hasan's
treatment notes consistently describe the claimant as
cooperative, relevant, and maintaining good eye contact.
The claimant was polite and communicated effectively and

27

spontaneously.

With regard to concentration, persistence or pace, the claimant has mild difficulties.  The claimant alleges that he cannot maintain attention for more than a couple of minutes and needs to be reminded of instructions.  The claimant's daily activities show that he can maintain attention sufficiently to drive a car, do shopping, and complete household chores such as laundry.  Dr. Hasan did not formally evaluate the claimant's attention and concentration but opined that the claimant would be capable of handling his own financial affairs if awarded benefits.

The claimant has attempted suicide several times since childhood.  But the record does not document any suicide attempts or any hospitalizations or need for crisis stabilization during the relevant time period.

The undersigned considered but cannot give any weight to the Medical Source Statement of Ability to Do Work-Related Activities (Mental) that Dr. Hasan completed in June 2006 (Exhibit B7F)...Limitations of the severity assessed are not supported by Dr. Hasan's clinical findings, and the assessment was not accompanied by any rationale other than a reference to the psychiatrist's progress notes.  In determining the nature and severity of the claimant's mental impairment, the undersigned adopts the opinions of the state agency psychological consultant, which are well supported by the medical evidence and consistent with the record as a whole (Exhibit B8F).

(Tr. at 16-18.)

Additionally, the ALJ stated that he

considered all symptoms and that extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p... (and) considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p...By earlier self-reports, given prescribed medications, the claimant has been getting six to ten hours of sleep a night, as well as napping regularly during the day.  Treatment records show that the claimant was advised of

the side-effects of medications but do not verify that
the claimant complained of the medications making him
drowsy.  The claimant has been on a fairly stable regimen
of psychotropic medications throughout the relevant time
period, during which he was repeatedly advised by his
primary care provider to reduce the amount of heavy work
that he was doing for the benefit of his musculoskeletal
conditions.  The claimant has acknowledged doing light
household chores, at most (Exhibits B6E and B10E and
testimony).

(Tr. at 20-22.)

## Evidence Submitted to Appeals Council

In _Wilkins v. Secretary_, 953 F.2d 93 (4th Cir. 1991), the

Appeals Council incorporated into the administrative record a letter

submitted with the request for review in which Wilkins' treating

physician offered his opinion concerning the onset date of her

depression. _Id._ at 96. The _Wilkins_ court decided it was required to

consider the physician's letter in determining whether substantial

evidence supported the ALJ's findings. _Id._   The Fourth Circuit

stated:

"Reviewing courts are restricted to the administrative
record in performing their limited function of
determining whether the Secretary's decision is supported
by substantial evidence." _Huckabee v. Richardson_, 468
F.2d 1380, 1381 (4th Cir. 1972); _see_ 42 U.S.C.A. § 405(g).
The Appeals Council specifically incorporated Dr. Liu's
letter of June 16, 1988 into the administrative record.
Thus, we must review the record as a whole, including the
new evidence, in order to determine whether substantial
evidence supports the Secretary's findings.

_Id._  Under _Wilkins_, the court must review the record as a whole,

including the new evidence submitted to the Appeals Council, in

order to determine whether the ALJ's decision is supported by

substantial evidence.

On November 14, 2008, Claimant's representative enclosed to the Appeals Council progress notes from New River Health Association covering the period from June 10, 2008 through October 6, 2008. (Tr. at 5-8, 634-43.)   Additionally, counsel submitted to the Appeals Counsel progress notes from New River Health Association covering the period from April 22, 2008 through May 30, 2008, and records from Beckley - Appalachian Regional Healthcare Hospital [BARH] dated April 30, 2008 through May 5, 2008.  (Tr. at 5-8, 619-30.)

These records were previously described in the record section of this Memorandum Opinion and document a deterioration in Claimant's mental health condition.  Records indicate Claimant was transported to the emergency room of BARH on April 30, 2008, after carving 720 into his left arm and putting a plastic bag over his head.  (Tr. at 624.)   Dr. Hasan, Claimant's treating psychiatrist and the psychiatrist on call at the hospital, assessed Claimant's condition as "Axis I - Major depression, recurrent, moderate to severe with psychotic features; Axis II - Personality disorder, not otherwise specified."  (Tr. at 626.)   Additional notes transcribed from Dr. Hasan on May 2, 2008, indicate:

> He was brought to the emergency room as he put a plastic bag over his head to get his medication.  The family says that he has been taking pain pills, which he denies, in the past.  He refuses to take medication at times and refuses to drink and said, "Water is poison."  He is hallucinating and hearing voices telling him to hurt

30

himself.  He is extremely depressed and despondent and a
sense of helplessness was prevailing.

(Tr. at 627.)

Progress notes from New River Health Association Clinic dated
July 11, 2008, July 25, 2008, September 2, 2008, September 18, 2008,
and October 6, 2008, show Claimant having inappropriate emotional
outbursts and seemingly uncontrolled psychological behavior which
are inconsistent with the finding of no severe mental impairment.
(Tr. at 636-42.)

The Appeals Council is not required to provide an in depth
explanation for its decision that the additional evidence offered
by Claimant does not warrant a change in the ALJ's decision.  In an
unpublished opinion, the United States Court of Appeals for the
Fourth Circuit, noting Eighth Circuit precedent, rejected the notion
that the Appeals Council must articulate its own assessment of
additional evidence.  <u>Hollar v. Commissioner of Social Sec. Admin.</u>,
194 F.3d 1304, 1304 (4th Cir. 1999), <u>cert. denied</u>, 530 U.S. 1219,
<u>reh'g denied</u>, 530 U.S. 1291 (2000) (citing <u>Browning v. Sullivan</u>, 958
F.2d 817, 822 (8th Cir. 1992)); <u>cf.</u>, <u>Harmon v. Apfel</u>, 103 F. Supp.2d
869, 872-73 (D. S.C. 2000) (court declined to follow <u>Hollar</u> and
instead, required that the Appeals Council articulate its reasons
for rejecting new, additional evidence).  Instead, the court,
relying on <u>Browning</u> and the fact that the regulations addressing
additional evidence do not direct the Appeals Council to announce
detailed reasons for finding that the evidence does not warrant a

change in the ALJ's decision, determined that the Appeals Council's explanation was sufficient.  20 C.F.R. § 404.970(b) (2001).  As in Hollar, the Appeals Council in this case did not err in failing to provide a more in depth explanation as to its decision.

The Appeals Council specifically incorporated the new evidence into the administrative record.  As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence.  Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991).

In considering Claimant's request for remand, the court notes initially that the social security regulations allow two types of remand.  Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).  Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g), based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted

32

medical evidence, the evidence must meet the requirements of 42
U.S.C. § 405(g) and <u>Borders v. Heckler</u>, 777 F.2d 954, 955 (4th Cir.
1985).[1]   In <u>Borders</u>, the Fourth Circuit held that newly discovered
evidence may warrant a remand to the Commissioner if four
prerequisites are met:   (1) the evidence is relevant to the
determination of disability at the time the application was first
filed and not simply cumulative; (2) the evidence is material to the
extent that the Commissioner's decision "might reasonably have been
different" had the new evidence been before him; (3) there is good
cause for the claimant's failure to submit the evidence when the
claim was before the Commissioner; and (4) the claimant has
presented to the remanding court "at least a general showing of the
nature" of the newly discovered evidence.   <u>Id.</u>

---

[1] Within relevant case law, there is some disagreement as to
whether 42 U.S.C. § 405(g) or the opinion in <u>Borders</u> provides the
proper test in this circuit for remand of cases involving new
evidence.   This court will apply the standard set forth in <u>Borders</u> in
accordance with the reasoning previously expressed in this district:

> The court in <u>Wilkins v. Secretary of Dep't of
> Health & Human Servs.</u>, 925 F.2d 769 (4th Cir.
> 1991), suggested that the more stringent  <u>Borders</u>
> four-part inquiry is superseded by the standard
> in 42 U.S.C. 405(g).   The standard in § 405(g)
> allows for remand where "there is new evidence
> which is material and . . . there is good cause
> for the failure to incorporate such evidence into
> the record in a prior proceeding."   However,
> <u>Borders</u> has not been expressly overruled.
> Further, the Supreme Court of the United States
> has not suggested that <u>Borders</u>' construction of §
> 405(g) is incorrect.   Given the uncertainty as to
> the contours of the applicable test, the Court
> will apply the more stringent <u>Borders</u> inquiry.

<u>Brock v. Secretary, Health and Human Servs.</u>, 807 F. Supp. 1248, 1250
n.3 (S.D.W. Va. 1992) (citations omitted).

Claimant discussed the additional evidence presented to the Appeals Council in the "Brief in Support of Judgment on the Pleadings" but did not argue for a remand based on the evidence. (Pl.'s Br. at 6-7, 15-18.)  The Commissioner provided no comment on the additional evidence presented to the Appeals Council. (Def.'s Br. at 1-21.)  While the subject ALJ Decision did not find Claimant to have a severe mental impairment, the previous ALJ Decision dated October 28, 2005, also denying disability benefits, did find Claimant to have severe impairments of affective disorder and personality disorder.  (Tr. at 29-36.)

The undersigned **FINDS** that remand is appropriate pursuant to the sixth sentence for consideration of new evidence concerning Claimant's mental impairment because this new evidence may cause the Commissioner's decision to be different.  The court further finds that the new evidence was not available to Claimant at the time of the hearing; thus there is good cause for the evidence not having been presented before.

Accordingly, by Order entered this day, this case is **REMANDED** for further proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g), and this action is placed on the court's inactive docket until the post-remand proceedings are completed and the Commissioner has filed the results of such proceedings with this court in compliance with the statutory requirements set forth in 42 U.S.C. § 405(g).

The Clerk is directed to transmit copies of this Order to all counsel of record.

ENTER: March 23, 2010

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge